874 F.2d 439
 131 L.R.R.M. (BNA) 2265, 57 USLW 2661,
Fed. Sec. L. Rep. P 94,419, 112 Lab.Cas. P 11,350
 AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, and Jeffrey B.
Cockrell, Plaintiffs-Appellants, Cross-Appellees,
v.
UAL CORPORATION, INTERNATIONAL ASSOCIATION OF MACHINISTS &
AEROSPACE WORKERS, et al., Defendants-Appellees,
Cross-Appellants.
 Nos. 88-3308, 88-3377 and 88-3387.
 United States Court of Appeals,
Seventh Circuit.
 Argued March 29, 1989.
Decided May 4, 1989.
 
 Robert S. Smith, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs-appellants, cross-appellees.
 Robert A. Siegel, Jerman, O'Melveny & Myers, Los Angeles, Cal., John A. Edmond, Guerrieri, Edmond & James, Washington, D.C., for defendants-appellees, cross-appellants.
 Before POSNER, FLAUM and RIPPLE, Circuit Judges.
 POSNER, Circuit Judge.
 
 
 1
 This suit arises out of efforts by United Air Lines' pilots to take over the airline, and by the airline's directors and the union representing the airline's machinists to prevent the takeover. When these efforts were first mounted, the airline was a subsidiary of a larger enterprise, and the contemplated takeover was of the entire enterprise. But the pilots wanted to divest the enterprise of its nonairline assets, so that when all the dust settled the pilots would own the airline and nothing else. To simplify exposition we shall pretend that the planned takeover was of a free-standing airline company--which United has since become as a result of a decision by the board of directors of the parent corporation to sell the nonairline assets.
 
 
 2
 Concretely the plan was for the airline pilots' union, representing United's pilots, to make a tender offer for all of United's common stock. For tax purposes the stock would be owned not by the pilots directly but in trust for them by an employee stock ownership plan (an "ESOP," as it is called). To finance this ambitious offer, which when first proposed in April 1987 carried a price tag of $4.5 billion, the pilots' union lined up a consortium of banks and other lenders to whom the pilots agreed to pledge the unencumbered assets of United if the tender offer succeeded. In short, a leveraged buyout was contemplated. (The union also planned to invest some of its pension assets in the venture.) To enable United to repay the lenders, the pilots offered to accept sharp reductions in their wages and benefits for several years (such concessions are called "give ups") and to effect other economies as well. Shares in the ESOP would be assigned to the pilots in proportion to their give-ups; other employees would obtain interests in the ESOP (or in additional ESOPs that would own the stock of United in concert with the pilots' ESOP) in proportion to their own give-ups. This is a barebones sketch of a more complex proposal (actually series of proposals), but the details that we have suppressed are not material to the appeals.
 
 
 3
 No tender offer has yet been made. The pilots cannot get final commitments on financing their takeover bid unless the anti-takeover defenses challenged in this litigation are rescinded.
 
 
 4
 United's directors did not want a tender offer by the pilots to succeed or even to be made. They were seconded in this wish by the machinists (most of whom in fact are baggage handlers rather than mechanics), who feared that among the economies the pilots would attempt to effect if they succeeded in taking over the airline would be a reduction in machinists' wages, benefits, and employment. The directors explored with the machinists the possibility of inserting in the collective bargaining agreement between United and the machinists' union what the plaintiffs dub with some imprecision "labor contract poison pills." A poison pill is, of course, a device by which a corporation's board of directors, fearing that the corporation is or may become the target of a hostile takeover, alters its shareholders' rights so as to make such a takeover more costly and difficult to bring off. For example, the board might adopt a shareholders' rights plan under which, if a tender offer for a specified fraction of the corporation's common stock was made, every shareholder who did not tender his shares would become entitled to a package consisting of additional shares issued by the corporation at a steep discount and of debentures. The maker of the tender offer would find that the stock he acquired was worth less than he had thought; he might have tendered for 80 percent of the company's shares, yet upon acquiring them might find that they gave him only 60 percent. And if the face amount of the debentures exceeded the revenue from the sale by the company of additional stock to nontendering shareholders at a discount, the company would be worth less than before the poison pill had been swallowed, and therefore the tender offeror's holdings would be worth less in absolute as well as relative terms as a result of the poison pill. See, e.g., Dynamics Corp. of America v. CTS Corp., 794 F.2d 250 (7th Cir.1986), rev'd on other grounds, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987); Dynamics Corp. of America v. CTS Corp., 805 F.2d 705 (7th Cir.1986).
 
 
 5
 In fact United's directors and the machinists' union agreed to insert in the machinists' collective bargaining agreement with the airline two provisions designed to thwart the pilot's impending takeover bid. Neither is a poison pill although the second resembles one. In at least one respect they are more lethal than poison pills: the board of directors cannot unilaterally rescind them, no matter how attractive the tender offer.
 
 
 6
 The first provision, which is section B(1)(b) of the collective bargaining agreement, provides that if United is taken over, the union shall have "the unilateral option ... [t]o serve a Section 6 notice immediately." The reference is to section 6 of the Railway Labor Act, 45 U.S.C. Sec. 156, which provides that before either the union or the employer may propose a change in their collective bargaining agreement, thereby inaugurating negotiations that if unsuccessful could result (following statutorily required mediation) in a strike, it must issue a notice of its intentions to the other party. So the issuance of a section 6 notice begins the countdown to a strike, although most of the time the parties are able to settle their differences eventually and a strike is averted. Airlines as well as railroads are subject to the Railway Labor Act.
 
 
 7
 Since either party to a railroad or airline collective bargaining agreement has a unilateral right to issue a section 6 notice at any time, section B(1)(b) is merely declaratory of the machinists' statutory rights. However, there was unrebutted testimony that the existence of this provision would deter the pilots' consortium of lenders from committing themselves to finance United's takeover bid. For they would be "lending into a strike," and banks won't do this. This testimony is a bit hard to credit, since the same lenders testified that they would take the risk of a machinists' strike provided section B(1)(b) was stricken. Why this superfluous section--and superfluous it is, for if the machinists want to begin the countdown that leads to a strike they will do so whether or not section B(1)(b) remains in their collective bargaining agreement with United--should have so fell an impact eludes us. On the other hand, the district judge found that section B(1)(b) was inserted solely to thwart the pilots' takeover bid, and this finding is not clearly erroneous. For reasons that will become clear, we shall not have to determine the precise impact of the provision on the pilots' scheme.
 
 
 8
 The other section that United and the machinists inserted in the collective bargaining agreement is more like a poison pill because it would dilute the pilots' share position, though what the device is called is supremely unimportant. Again the district judge found on adequate evidence that its only purpose was to thwart a takeover bid by the pilots. The device, section C of the machinists' agreement, must be set out in full:
 
 
 9
 In the event the Company or any other party provides or agrees to provide any union-represented labor group with a common stock, preferred stock, stock option, warrant, Employee Stock Ownership Program, or employee equity/participatory ownership of any type ("employee stock plan"), or profit-sharing, such plan shall be offered and allocated to each union-represented labor group on the same basis by reference to "market" wages, benefits and work rules relative to those in effect upon implementation of such plan.
 
 
 10
 In the first instance, the determination of "market" levels of wages, benefit levels and work rules for the purposes of this agreement shall be by the carrier for all employee groups. A joint arbitration procedure including all parties will be established for the settlement of any dispute over market wages, benefit levels and work rules for all employee groups. Such arbitration procedures and standards shall be detailed in a stipulation agreement entered as soon as practicable.
 
 
 11
 The pilots are a "union-represented labor group"--they are represented by the Air Line Pilots Association. So if they succeed in taking over United, United will have to offer its other unionized employees--the machinists and the flight attendants--a similar deal. The machinists call section C a "most favored nation" or "me too" clause, but it is more than that. It requires the stock of United to be allocated among the various unionized groups of employees (pilots, machinists, and flight attendants) on the basis of the wage and other concessions that each group makes relative to the arbitrators' determination of each group's "market wage." Suppose the arbitrators determined that the market wage for pilots (not the wage they are receiving from United, but the wage they would receive in a competitive, i.e., nonunionized, labor market) was $40 an hour, and the market wage for machinists was $10 an hour. Suppose that the wages United was actually paying them were $50 and $10. Suppose the pilots were willing to offer "give-ups" worth $11 an hour and the machinists $2. (Ignore the question why the machinists would be willing to work for wages below what they could get elsewhere.) And for simplicity suppose that pilots and machinists work the same number of hours on average. Then as we understand section C it would entitle each machinist to twice as much stock as each pilot, because the machinist would be giving up twice as much relative to the market benchmark as the pilot ($2 versus $1). The pilots, in contrast, envisage allocating stock in the ESOP among the unionized groups in proportion to the absolute, rather than relative, value of their give-ups, which in our hypothetical example would give each pilot more than five times as many shares in the ESOP as each machinist. The effect of the machinists' agreement with United, if it went into effect upon a takeover by the pilots, would thus be to dilute the pilots' ownership and control.
 
 
 12
 United's pilots brought this suit against United and the machinists in a federal district court in Illinois, seeking to enjoin section C of the machinists' agreement as a violation of the Railway Labor Act; in pendent counts, the pilots sought to enjoin sections B(1)(b) and C as violations of Delaware corporation law. The district judge rendered judgment after a two-day bench trial. See 699 F.Supp. 1309 (N.D.Ill.1988). He held, first, that the dispute between the pilots on the one hand and United and the machinists' union on the other was a major rather than minor dispute under the Railway Labor Act. A minor dispute must be referred to an adjustment board (an arbitral tribunal), but federal district courts have their usual equity jurisdiction when it comes to major disputes. Second, the judge held that the Act preempts state takeover law; this holding knocked out the pilots' claim that the challenged provisions of the collective bargaining agreement between United and the machinists' union violated Delaware corporation law. Third, however, he held that section C of the agreement violates sections 2 First and 2 Ninth of the Railway Labor Act, 45 U.S.C. Secs. 152 First and Ninth, because it changes the terms and conditions of the pilots' (also the flight attendants') employment without their having had a chance to bargain collectively with United over the change. The upshot was that the district judge enjoined section C only, under the Railway Labor Act only. Both sides appeal, the pilots claiming that the Act does not preempt state corporation law and that sections B(1)(b) and C of the machinists' agreement violate Delaware law, and United and the machinists claiming that the dispute is minor and therefore not justiciable without prior resort to an adjustment board (i.e., arbitration), and alternatively that section C does not violate the Railway Labor Act.
 
 
 13
 The Act does not use the terms "major" or "minor" dispute. These are judicial appellations. They derive from the fact that the Act creates two different systems for resolving labor disputes in the railroad and airline industries other than by strikes. One system requires bargaining (cf. 45 U.S.C. Sec. 152 First), mediation, conciliation, and "cooling off" periods; this is the system in which section 6 figures. The other requires compulsory arbitration, specifically of disputes "growing out of grievances or out of the interpretation or application of [collective bargaining] agreements," Sec. 153 First (i), subject to excruciatingly narrow judicial review of the arbitrators' awards. See Sec. 153 First (q); Brotherhood of Locomotive Engineers v. Atchison, Topeka & Santa Fe Ry., 768 F.2d 914, 921 (7th Cir.1985); Hill v. Norfolk & Western Ry., 814 F.2d 1192, 1194-95 (7th Cir.1987); Burlington Northern R.R. v. United Transportation Union, 862 F.2d 1266, 1271-77 (7th Cir.1988). The duty that has been inferred from section 2 First to bargain collectively is, like other duties created by federal statute, enforceable by an injunctive action in federal district court under the federal-question jurisdiction. See, e.g., Chicago & North Western Ry. v. United Transportation Union, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971). Thus the first remedial route under the Railway Labor Act that we have described eventuates in a regular equity proceeding, while the second eventuates in limited judicial review of an arbitral decision. The term "major" dispute, which has been attached to disputes that get shunted to the first route, comes from the fact that if one party to a labor agreement refuses to bargain with the other, this is an ominous sign that a strike is looming; and a transportation strike can be a major disruption. Since arbitration under the Railway Labor Act is binding, but collective bargaining even if conducted in good faith and with the aid of mediation, conciliation, cooling-off periods, etc., may break down and a strike ensue, see, e.g., Burlington Northern R.R. v. Brotherhood of Maintenance of Way Employes, 481 U.S. 429, 107 S.Ct. 1841, 1850-51, 95 L.Ed.2d 381 (1987), the courts construe "minor dispute" broadly, trying to switch as many disputes as possible into the track that leads to their being resolved without any possibility of a strike. See Brotherhood of Locomotive Engineers v. Atchison, Topeka & Santa Fe Ry., supra, 768 F.2d at 920; see generally National Railway Labor Conference v. International Ass'n of Machinists, 830 F.2d 741, 745-48 (7th Cir.1987); Air Line Pilots Ass'n v. Eastern Air Lines, Inc., 869 F.2d 1518 (D.C.Cir.1989).
 
 
 14
 The dispute between the pilots and United over provisions in United's collective bargaining agreement with the machinists is not "major" in the sense that it is likely to lead to a pilots' strike. But criterion and rationale are not synonyms; and this dispute is as securely within judicial rather than arbitral jurisdiction as would be a complaint by black employees that the union is not complying with its implied statutory duty to represent the workers in the collective bargaining unit without racial discrimination (which also is not the kind of dispute likely to provoke a strike). See, e.g., Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952); Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A "grievance," for purposes of the Act's scheme of compulsory arbitration, is a complaint that the employer is violating the collective bargaining agreement with the union representing the employee who has the grievance. Lancaster v. Norfolk & Western Ry., 773 F.2d 807, 814 (7th Cir.1985); cf. International Ass'n of Machinists v. General Electric Co., 865 F.2d 902, 905-06 (7th Cir.1989). The pilots' dispute with United is not a grievance in this sense. They do not contend that United has violated its collective bargaining agreement with them. Nor does United or the machinists argue that in disclaiming any such contention the pilots are being coy. All that the pilots are complaining about is a statutory violation--and the very statutory violation that is charged in the typical "major" dispute, namely a violation of the statutory duty to bargain collectively. The complaint is that United has agreed with the machinists to change the pilots' terms of employment (specifically, the terms of an ESOP or other stock distribution to employees or for their benefit) without bargaining over the change with the pilots.
 
 
 15
 The proper route for complaining about a statutory violation is a suit in federal district court, not a proceeding before an adjustment board or other arbitral body. Arbitrators are experts in the interpretation of agreements. The pilots do not base their complaint on the terms of any agreement. It is true that since the basis of the alleged violation of the statute is a pair of provisions in another agreement--the collective bargaining agreement between United and the machinists--the tribunal that adjudicates the statutory issue will have to interpret the other agreement. But this does not make the pilots' grievance a grievance under that agreement. They claim no rights under the agreement between United and the machinists; they are not parties to or intended beneficiaries of that agreement. The adjustment board may not even have jurisdiction to make an interpretation of that agreement for use in this lawsuit, for the statute contemplates the issuance by such boards of awards that "shall be final and binding," 45 U.S.C. Sec. 153 First (m), not awards that are ancillary to a proceeding in another forum. We therefore agree with Judge Friendly in not reading the Act "as providing for arbitration where the board of adjustment could only render something in the nature of an advisory opinion that might assist a court in deciding an issue of legality confided to it." Seaboard World Airlines, Inc. v. Transport Workers Union, 425 F.2d 1086, 1090 (2d Cir.1970). And where the adjustment board cannot provide a remedy that will protect a party from the consequences of a violation of the Railway Labor Act, the district court has an equitable jurisdiction to do so, whether or not the violation seems "major" or "minor" in an ordinary-language sense. See Brotherhood of Railway Clerks v. Atchison, Topeka & Santa Fe Ry., 847 F.2d 403, 408 (7th Cir.1988).
 
 
 16
 We conclude that the district judge had jurisdiction to adjudicate the pilots' statutory challenge to provisions in the machinists' agreement. See, e.g., Railway Labor Executives' Ass'n v. Boston & Maine Corp., 808 F.2d 150, 157-58 (1st Cir.1986). The next question is whether the judge was correct that section C of the agreement violated the pilots' right to bargain collectively over the terms of their employment. The argument against his conclusion is that section C affects pilots only in their capacity as investors, which of course is not a respect in which the airline is required to bargain collectively with them. Section C refutes the argument. It applies to any "employee" stock plan, that is, to any distribution of stock to (or for the benefit of) employees in their capacity as employees. Remember how the pilots' takeover is supposed to work. The stock will be acquired by an ESOP and shares in the ESOP will be allocated in proportion to give-ups by the airline's employees of wages and benefits to which they would otherwise be entitled. The interests that the employees acquire in the ESOP (or series of ESOPs) will thus be substitutes for wages (and benefits), and the allocation of those interests is therefore among the terms and conditions of employment over which an employer subject to the Railway Labor Act is required to negotiate with its employees. Section C will affect the value of this wage substitute, and will therefore affect the terms of the pilots' employment without giving their union a chance to bargain collectively over the change. United has indeed violated the Act.
 
 
 17
 The pilots do not challenge section B(1)(b) of the machinists' agreement as a violation of United's duty to bargain collectively, for this "contract reopener" provision affects the pilots primarily as investors and only obliquely as employees. But they do challenge it as a violation of Delaware corporation law. Corporation law places limits on efforts to fend off hostile takeovers, but the district judge held that the Railway Labor Act preempts state regulation of such efforts when they are embodied in a collective bargaining agreement subject to the Act. United and the machinists acknowledge as they must that the logic of the judge's reasoning applies equally to collective bargaining agreements regulated not by the Railway Labor Act but by the National Labor Relations Act.
 
 
 18
 If a federal and a state statute create inconsistent duties, the state statute must of course give way; the supremacy clause requires no less. If they do not create inconsistent duties yet enforcement of the state statute would (having due regard for the strength of the state interest) stand as a substantial and unwarranted obstacle to attaining the objectives of the federal statute, again the state statute is preempted. This is done by interpreting the federal statute to outlaw any such obstacles, and then bringing the supremacy clause into play again. See, e.g., Brown v. Hotel & Restaurant Employees, 468 U.S. 491, 509, 104 S.Ct. 3179, 3189, 82 L.Ed.2d 373 (1984); Massachusetts Medical Society v. Dukakis, 815 F.2d 790, 791 (1st Cir.1987). This is an example of creative interpretation, since ordinarily Congress will not have foreseen, and by hypothesis will not have made express provision for, the creation by the state of an (ordinarily unintended) obstacle to the fulfillment of Congress's purposes.
 
 
 19
 Insofar as Delaware law requires that the board of directors proceed with all due deliberation in deciding whether to adopt defensive measures against a takeover, see, e.g., Smith v. Van Gorkom, 488 A.2d 858 (Del.1985); Ivanhoe Partners v. Newmont Mining Corp., 535 A.2d 1334, 1341-42 (Del.1987)--measures that may include a management-sponsored ESOP, see EAC Industries, Inc. v. Frantz Mfg. Co., 11 Del. J. Corp. L. 608, 620, 1985 WL 11582 (Del. Ch. June 28, 1985); In re Amsted Industries Inc. Litigation, Civ. No. 8224, 1988 WL 92736 (Del.Ch. Aug. 24, 1988), which in a realistic sense section C of the machinists' agreement with United is--there is a theoretical possibility of conflict with the employer's duty under federal labor law to bargain collectively. Bargaining often continues down to the wire and if negotiators are not vested with broad authority the bargaining may collapse and a strike ensue. So if a union sprung a demand for a poison pill at the eleventh hour, the employer might find itself caught between its duty under state law to refer the matter to the board of directors, which in turn would be required to consult with its financial advisors, and a duty under federal law to respond immediately to the union's demarche. But this is theory, not practice, at least as far as the present case is concerned. And even as theory it is suspect because any illegal proposal could be made at the last minute, and it cannot be right that this bare possibility preempts all state laws that set limits on what parties to collective bargaining agreements can agree to.
 
 
 20
 The next question is whether Delaware corporation law, while not inconsistent with the Railway Labor Act in the strict sense of imposing inconsistent duties, nevertheless might thwart the Act's objectives. Having to negotiate with one eye on state corporation law could complicate collective bargaining negotiations between United and its unions. United might find itself in a position where to buy labor peace it had to grant the machinists the protection they sought against a takeover that might result in a diminution in their wages, benefits, or employment, yet where it could not do so without violating Delaware's corporation law. But of course this would be equally true if the machinists wanted a provision in their collective bargaining agreement that machinists shall receive half their pay in cocaine or that replacement workers shall be poisoned within 24 hours of being hired. The federal statutes that encourage collective bargaining do not seek to do so by granting employers and unions an exemption from state laws of general applicability, whether they are laws against poisoning people, or beating up people, cf. Belknap, Inc. v. Hale, 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983); National Metalcrafters v. McNeil, 784 F.2d 817, 828 (7th Cir.1986), or laws limiting the use of poison pills or other anti-takeover devices designed to poison not people but transactions, or even laws seeking to reduce the costs of employers, as in Massachusetts Nurses Ass'n v. Dukakis, 726 F.2d 41 (1st Cir.1984), and Southwestern Bell Tel. Co. v. Arkansas Public Service Comm'n, 824 F.2d 672 (8th Cir.1987), or guaranteeing workers minimum health benefits, as in Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 747-57, 105 S.Ct. 2380, 2393-98, 85 L.Ed.2d 728 (1985), or severance pay, as in Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 107 S.Ct. 2211, 2221-23, 96 L.Ed.2d 1 (1987).
 
 
 21
 United and the machinists do not contend that Delaware's legislature and courts are seeking to create and impose a rival labor code to the RLA or the NLRA, as in National Metalcrafters v. McNeil, supra, 784 F.2d at 828. They contend that the evenhanded application of Delaware corporation law might forbid an anti-takeover measure contained in a labor contract. And so it might. But this is not a persuasive argument for federal preemption, unless it can be shown that allowing poison pills or other anti-takeover devices to be written into such contracts regardless of whether the devices violate state law is necessary in order to reduce the number or severity of transportation strikes or otherwise to attain the essential objectives of the Railway Labor Act. United and the machinists make no such showing. This is the first case that has come to our attention where anti-takeover devices have been planted in a collective bargaining agreement, and this makes it hard for us to believe, in the absence of evidence, that freedom to negotiate for their inclusion unhampered by state law is necessary to the system of collective bargaining established by the Act.
 
 
 22
 Although preemption does not seem required to further the objectives of federal law, it could have a catastrophic effect on the efforts of states to regulate takeovers, and this consideration is germane since, realistically, a judgment about preemption requires a weighing of federal and state interests. See, e.g., Local 926, International Union of Operating Engineers v. Jones, 460 U.S. 669, 676, 103 S.Ct. 1453, 1458, 75 L.Ed.2d 368 (1983); Belknap, Inc. v. Hale, supra, 463 U.S. at 498, 103 S.Ct. at 3177. Any firm that had a collective bargaining agreement with a significant fraction of its work force could adopt anti-takeover measures with complete impunity, simply by writing them into the collective bargaining agreement. Unionized firms would be immune to hostile takeovers if, as is common, the union feared that a buyer of the company would seek to economize on its labor costs by renegotiating the company's collective bargaining agreements or even by selling off the company's assets to purchasers who would take free of any obligation under such agreements. For us to create in the name of preemption so enormous a loophole in state regulation, without any evidence that the loophole is necessary to protect the objectives of federal labor law, would be reckless. Like the criminal law, the regulation of corporations is, as the Supreme Court reminded us in the CTS case, a matter of primary state responsibility. See 107 S.Ct. at 1650-52; see also Cort v. Ash, 422 U.S. 66, 84-85, 95 S.Ct. 2080, 2094-95, 45 L.Ed.2d 26 (1975). In such areas the presumption is against federal preemption. California v. ARC America Corp., --- U.S. ----, ----, 109 S.Ct. 1661, 1664, 104 L.Ed.2d 86 (1989). And presumption or not, we do not think that the framers of the Railway Labor Act meant to deal the body blow to state regulation of corporations that a finding of preemption in this case would administer.
 
 
 23
 All this is not to suggest that there could never be preemption by the Railway Labor Act of state corporation law. If the pilots were seeking to enjoin the issuance by the machinists of a section 6 notice, on the ground that the machinists, acting in cahoots with United's board of directors, were trying to thwart a takeover bid, in violation of Delaware law, a real issue of preemption would be presented. We need not decide how it should be resolved. We hold only that wholesale preemption, which would make all anti-takeover measures inviolate, provided only that they were written into collective bargaining agreements, is not required by the purposes of the Railway Labor Act.
 
 
 24
 The final question is whether to remand the case to the district court for an initial determination concerning the lawfulness of sections B(1)(b) and C of the machinists' agreement under Delaware law or to make our own determination. Since the district judge made comprehensive findings of fact, the latter course is not absolutely foreclosed to us. See, e.g., Otto v. Variable Annuity Life Ins. Co., 814 F.2d 1127, 1138 and n. 11 (7th Cir.1986); White v. Elrod, 816 F.2d 1172, 1176 (7th Cir.1987). But for a variety of reasons we think it would be improper to follow it in this case. The questions of Delaware law presented by the pilots' complaint are difficult ones, if only because the Delaware courts have never had occasion to rule on the lawfulness of a takeover defense incorporated into a labor contract. With respect to section B(1)(b) there is the additional question whether it really constitutes an obstacle to the pilots' plans--a question on which the judge did not opine. If the federal claims had been dismissed before trial, the proper course (in the absence of exceptional circumstances) would have been to relinquish jurisdiction of the pendent claims to the courts of Delaware. See, e.g., Disher v. Information Resources, Inc., 873 F.2d 136-138 (7th Cir. 1989). (Of course this would not ensure that the Delaware courts would decide them, since the pilots might be able to sue in the courts of another state.) But since the pendent claims were tried and in the course of the trial the facts relating to them thoroughly aired, considerations of judicial economy dictated retention of pendent jurisdiction. See, e.g., Graf v. Elgin, Joliet & Eastern Ry., 790 F.2d 1341, 1347-48 (7th Cir.1986); Employers Insurance of Wausau v. Suwannee River Spa Lines, Inc., 866 F.2d 752, 767 and n. 30 (5th Cir.1989). This meant, however, that Judge Zagel became familiar with the state-law issues even though he found it unnecessary to decide them. We would benefit from his views on them.
 
 
 25
 Another consideration is decisive. Although we review rulings on pure questions of law de novo, that is, without giving the district judge's ruling any more weight than it intrinsically deserves (which is the same weight we would give to a treatise or a law-review article), the application of law to fact--the determination whether the particular anti-takeover devices adopted by United and the machinists violate Delaware law--we review under the clearly-erroneous standard (with exceptions not relevant here). See Foy v. First National Bank, 868 F.2d 251, 254 (7th Cir.1989) (collecting cases). For us to make that application ourselves would infringe the district judge's authority under Fed.R.Civ.P. 52(a), unless the proper application were crystal clear in the particular case. See Seattle Box Co. v. Industrial Crating & Packing Inc., 756 F.2d 1574, 1578 (Fed.Cir.1985); Smith Kline Diagnostics, Inc. v. Helena Laboratories Corp., 859 F.2d 878, 886 n. 4 (Fed.Cir.1988). But we cannot say that it is crystal clear in this case.
 
 
 26
 The pilots urge us to bypass the judge because of the fragility of tender offers. Fragile they are, but since the most recent deal that the pilots put together with their lenders (in May 1988) envisaged an offer price that now is below the market price of United's stock, the deal is obsolete and will have to be restruck, so there is no overwhelming urgency. We have expedited the preparation of this opinion, however, and we are confident that Judge Zagel will expedite his consideration of the state law issues on remand.
 
 
 27
 To summarize, the district court's ruling that section C of the machinists' agreement violates the Railway Labor Act is affirmed, but the dismissal of the pendent counts is reversed and the case remanded for further proceedings consistent with this opinion. Circuit Rule 36 shall not apply on remand, and costs shall be awarded to the pilots in this court.
 
 
 28
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.