INTERNATIONAL BROTHERHOOD
OF TEAMSTERS, Plaintiff,

v.

CHAUTAUQUA AIRLINES, Defendant.

No. IP 01–1617–C–M/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Dec. 5, 2001.

Edward J. Fillenwarth Jr., Fillenwarth Dennerline Groth & Towe, Indianapolis, IN, Andrew D. McClintock, Ford & Harri-

son, Atlanta, GA, and Roland P. Wilder Jr., Baptiste & Wilder, Washington, DC, for Plaintiff.

David J. Carr, Ice Miller, Indianapolis, IN, and Dannie B. Fogleman, Ford & Harrison, Washington, DC, for Defendant.

### ORDER ON MOTION FOR PRELIMINARY INJUNCTION

McKINNEY, Chief Judge.

This matter is before the Court on Plaintiff International Brotherhood of Teamsters' ("IBT" or "the Union") motion for a preliminary injunction. IBT represents the pilots, flight attendants, and fleet and passenger service agents of Defendant Chautauqua Airlines ("Chautauqua" or "the Company"). After the devastating terrorist attacks of September 11, 2001, Chautauqua took several actions which IBT claims were unlawful. In particular, Chautauqua terminated approximately 20% of its probationary pilots, and 15–20% of its flight attendants. It also reduced the workweek for full-time fleet and passenger service agents from 40 hours to 32 hours. In addition, Chautauqua has refused to engage in bargaining or mediation after the parties' unsuccessful attempt to make changes to the pilots' collective bargaining agreement. IBT claims that all of Chautauqua's actions violated the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*[1] Of course, Chautauqua denies any wrongdoing, and attempts to rest upon the terms of the relevant collective bargaining agreements as justification for most of its actions. The parties have fully briefed their positions, and offered additional evidence at a hearing conducted on November 21, 2001. The Court will now consider the parties' arguments.

---

1. The Union also alleged in its complaint that Chautauqua had refused the pilots' their contractual right to exchange paid days off for pay. The Union has since conceded that the issue is moot, so the Court will not consider it.

## I. FACTUAL BACKGROUND

Chautauqua is a corporation organized and existing under the laws of the State of Delaware, with its principal offices in Indianapolis, Indiana. It is a "common carrier by air engaged in interstate or foreign commerce," and thus is covered by the RLA. *Wayne Heller Declaration* ¶ 4. Chautauqua is a regional airline that provides feeder service to USAirways, American Airlines/TWA, and America West Airlines. The company services approximately 42 cities in the United States and Canada, and it owns or leases over 50 aircraft. *Id.* ¶ 5.

Local 747 is the local union designated by the IBT Airline Division to provide day-to-day representation to Chautauqua's pilots. *Ernest E. Sowell Declaration,* ¶ 1. Chautauqua and Local 747 are parties to a collective bargaining agreement, which was effective November 17, 1998. *Id.* ¶ 3. Local 135 of the IBT represents the flight attendants and fleet and passenger service agents of Chautauqua. *Barry D. Schimmel Dec.* ¶ 2. Local 135 had collective bargaining agreements with Chautauqua for those classes of employees, also.

### A. CHAUTAUQUA TERMINATES PROBATIONARY PILOTS

Following the terrorist attacks on September 11, 2001, Chautauqua, like other airlines, saw a dramatic drop in business. Consequently, it became necessary to reduce the volume of operations, and, as a corollary, the number of pilots it employed. *Heller Dec.* ¶ 18. Rather than furlough the excess pilots pursuant to Article 11 of the pilots' collective bargaining agreement, the Company terminated the employment of some probationary pilots. *Id.* ¶ 19. In fact, during the week of September 24, 2001, Chautauqua notified Local 747 that it would terminate 125 pilots the following week. The Company provided no disciplinary or performance-related reasons for the discharge of these pilots. *Sowell Dec.*

¶ 12. As a result of the terminations, the pilots lost their seniority and recall rights. *Id.* ¶ 20.

Article 11 of the pilots' collective bargaining agreement provides for certain procedures where a surplus of pilots exists that necessitates a reduction in force. *Plaintiff's Ex. 2.* That same agreement, however, also provides in Article 18 that probationary pilots have no right to file a grievance over issues of discipline and/or discharge decisions. *Id.*

If Chautauqua had immediately furloughed the pilots in order of seniority, it would have been forced to carry an unsustainable payroll burden to maintain its schedule. Using the termination option allowed the Company to maintain its staffing levels in such a way that it avoided a series of training events that would have involved retraining approximately 27 pilots, taken at least 2–½ months, and cost over $400,000. According to the Company, its very survival dictated that the excess probationary pilots be terminated immediately. *Heller Dec.* ¶ 21.

### B. CHAUTAUQUA TERMINATES FLIGHT ATTENDANTS

On or around September 24, 2001, Chautauqua also informed approximately 51 flight attendants that their positions had been eliminated and that they were being terminated effective September 28, 2001. In all, the Company terminated approximately 15–20% of the flight attendant workforce. *Schimmel Dec.* ¶ 6. Article 11 of the flight attendants' collective bargaining agreement provides for certain procedures where a surplus of flight attendants exists that necessitates a reduction in force. *Id.* ¶ 6. Rather than acting under Article 11, Chautauqua terminated the flight attendants' employment. Under Article 18 of the flight attendants' collective bargaining agreement, however, probation-

ary flight attendants cannot file a grievance related to any discipline and/or discharge. *Ex. 3 to Schimmel Dec.*

## C. REDUCTION OF WORKWEEKS

According to Local 135, an established past practice in the fleet and passenger agent class is that full-time employment is based upon a 40 hour workweek. *Schimmel Dec.* ¶ 11. For many years, full-time employee status has been based upon a 40 hour workweek. *Id.* On September 18, 2001, Joe S. Dale of Chautauqua sent an e-mail to Schimmel, the business representative for Local 135, requesting the Union's agreement to a reduction in the scheduled hours for full-time employees from 40 hours to 32 hours. *Id.* ¶ 12. Schimmel responded with the terms under which the Union would agree to such an arrangement. *Id.* ¶ 13. On September 21, 2001, Schimmel met with Chautauqua representatives to discuss the Company's proposal, but the parties were unable to reach an agreement. *Id.* ¶ 14. On September 22, 2001, Jerry Balsano, Chautauqua Vice President for Customer Relations, sent Schimmel an e-mail setting forth additional changes the company desired. *Id.* ¶ 15. Two days later, Balsano notified the Union that Chautauqua had withdrawn its request for the identified changes. *Id.* ¶ 16.

On or around September 28, 2001, Chautauqua reduced full-time workweek schedules to 32 hours in many stations. *Id.* ¶ 17. Chautauqua did not obtain Local 135's agreement to the changes prior to making them. *Id.* ¶ 18. At the hearing, there was evidence that as of November 19, 2001, there were employees scheduled less than 80 hours per two-week pay period at the following locations: Altoona, Pennsylvania; Evansville, Indiana; and Lancaster, Pennsylvania. *Defendant's Ex. 1.*

## D. THE COMPANY'S REFUSAL TO PARTICIPATE IN MEDIATION

At the hearing, Heller, Vice President of Flight Operations for Chautauqua, testified about the events leading up to Chautauqua's refusal to participate in mediation. In September 1999, Chautauqua and the Union attempted to extend the pilots' collective bargaining agreement. After its defeat, the Union told Chautauqua that it would go out and seek input from its pilots regarding what changes would facilitate another extension of the agreement. This apparently led to the parties' agreement on November 28, 2000, to voluntarily negotiate through interest-based bargaining for changes to the agreement. *Sowell Dec.* ¶ 5. During the course of approximately seven months of bargaining, the parties exchanged numerous proposals setting forth their desired changes to the contract. *Id.* ¶ 6. In July 2001, the parties reached a tentative agreement on a new collective bargaining agreement. That tentative agreement was submitted to the pilots for ratification on August 1, 2001. The ballots were counted on August 30, 2001. The pilots rejected the tentative agreement by a vote of 239 to 35. *Id.* ¶ 7.

Following the pilots' rejection of that agreement, the IBT submitted the parties' bargaining dispute to the National Mediation Board ("NMB") for assistance in mediation services. *Id.* ¶ 8. The collective bargaining agreement provided that the parties may exchange § 6 notices, which serve to open collective bargaining for a revised agreement, between approximately July 17 and August 17, 2001. *Heller Dec.* ¶ 9. Specifically, the agreement provided as follows:

*DURATION*

This Agreement will become effective on date of signing and will continue in full force and effect through November 17,

2001 and will renew itself without change until each succeeding November 17 thereafter, unless written notice of intended change is served in accordance with Section 6, Title I, of the Railway Labor Act, as amended, by either party thereto at least ninety (90) but not more than one hundred and twenty (120) days prior to November 17, 2001, or any November 17 thereafter.

*Plaintiff's Ex. 2.*

Because the Union failed to serve any § 6 notice within the contractually-mandated time frame, Chautauqua informed the NMB that no dispute existed for the Board's jurisdiction. *Id.* ¶ 9. Chautauqua has refused to engage in additional bargaining because of IBT's failure to provide proper notice. *Id.* ¶ 10. According to Chautauqua, the parties were never engaged in § 6 bargaining, but only informal bargaining. *Id.* ¶ 15.[2]

## II. *STANDARDS*

### A. PRELIMINARY INJUNCTION STANDARD

■ In assessing whether a preliminary injunction is warranted, a court must consider whether the party seeking the injunction has demonstrated that: (1) it has a reasonable likelihood of success on the merits of the underlying claim; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm if the preliminary injunction is denied; (4) the irreparable harm the party will suffer without injunctive relief is greater than the harm the opposing party will suffer if the preliminary injunction is granted; and (5) the preliminary injunction will not harm the public interest. *Kiel v. City of Kenosha,* 236 F.3d 814, 815–816 (7th Cir.2000).

### B. THE RAILWAY LABOR ACT

■ The RLA was enacted, among other reasons, "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein," and "to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions." *United Air Lines v. International Ass'n. of Machinist and Aerospace Workers,* 243 F.3d 349, 361 (7th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 202, 151 L.Ed.2d 143 (2001) (quoting 45 U.S.C. § 151a). The intent of the RLA is "to encourage collective bargaining by the parties 'in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce.'" *Id.* In 1936, Congress extended the RLA to cover the airline industry. *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 248, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994).

■ Under the RLA, district courts generally have no jurisdiction to rule on the merits of a labor dispute. *Brotherhood of Locomotive Engineers v. Springfield Terminal Railway Co.,* 210 F.3d 18, 23 (1st Cir.), *cert. denied,* 531 U.S. 1014, 121 S.Ct. 571, 148 L.Ed.2d 489 (2000). Instead, a district court should only decide what type of statutorily-mandated dispute resolution procedure is appropriate, depending on the category of the dispute. *Id.* Under the RLA, the Supreme Court distinguishes between "major" and "minor" disputes between carriers and employees regarding their collective bargaining agreements. *See Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 302, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989). Major disputes involve disputes over the formation of collective agreements or efforts to secure them.

---

**2.** The parties had previously engaged in voluntary bargaining in 1999 in an attempt to reach an extension of the current collective bargaining agreement. When they were unable to reach an agreement, IBT made no claim that the parties had, by implication, agreed to bargain pursuant to § 6 of the RLA. *Heller Dec.* ¶ 17.

They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. *Id.* Major disputes may involve a carrier's attempt to modify rates of pay, rules, or working conditions in a fashion not even arguably covered by the collective bargaining agreement. *Springfield Terminal,* 210 F.3d at 23. Where major disputes are involved, the RLA requires the parties to exhaust a lengthy bargaining and mediation process. *ABX Air, Inc. v. Airline Professionals Ass'n of the International Brotherhood of Teamsters,* 266 F.3d 392, 396 (6th Cir.2001). Both are obligated to maintain the status quo during the required process, and the courts can enjoin any status quo violation. *Id.* (citing *Consolidated Rail,* 491 U.S. at 302–303, 109 S.Ct. 2477). If no agreement is reached, the parties may resort to economic force, including strikes. *Id.*

Minor disputes, on the other hand, involve controversies over the meaning or application of an existing collective bargaining agreement provision regarding pay, rules, or working conditions to a specific situation or omitted case. *Id.* If discussions fail to yield a solution, both parties are subject to compulsory and binding arbitration before an adjustment board under 45 U.S.C. § 152, Sixth, and § 184. *Id.* While the courts have no jurisdiction to resolve the substance of minor disputes, they can enjoin strikes over minor disputes in order to enforce compliance with the RLA's dispute resolution provisions. *Id.*

The term "major" dispute comes from the fact that if one party to a labor agreement refuses to bargain with the other, this is an ominous sign that a strike is looming. *Air Line Pilots Ass'n, International v. UAL Corp.,* 874 F.2d 439, 443–444 (7th Cir.1989). Since arbitration under the RLA is binding, but collective bargaining—even if conducted in good faith and with the aid of mediation, conciliation, cooling-off periods, etc.—may break down and a strike ensue, courts construe "minor dispute" broadly to try to switch as many disputes as possible into the track that leads to their being resolved without any possibility of a strike. *Id.* Indeed, courts have noted that it is a "light burden" of establishing arbitrability under the RLA. *Railway Labor Executives Ass'n v. Chesapeake Western Railway,* 915 F.2d 116, 119 (4th Cir.1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1312, 113 L.Ed.2d 246 (1991) (citing *Consolidated Rail,* 491 U.S. at 307, 109 S.Ct. 2477). *Accord, Brotherhood of Railroad Signalmen v. Burlington Northern Railroad Co.,* 829 F.2d 617, 619 (7th Cir.1987) (noting the "relatively light burden that the railroad must meet in order to show that its unilateral actions constitute a minor dispute"). The Supreme Court has held that:

> .... if an employer asserts a claim that the parties' agreement gives the employer the discretion to make a particular change in working conditions without prior negotiation, and if that claim is arguably justified by the terms of the parties' agreement (*i.e.,* the claim is neither obviously insubstantial or frivolous, nor made in bad faith), the employer may make the change and the courts must defer to the arbitral jurisdiction of the Board.

*Consolidated Rail,* 491 U.S. at 310, 109 S.Ct. 2477.

The parties agree that the primary task for the Court in this matter is to determine whether their disputes are major or minor. If they are major, the Court has the ability to grant relief to the Union for the Company's alleged violations of the status quo. If the disputes are minor, the Court should dismiss the matter for lack of jurisdiction, and defer to the arbitral jurisdiction of the appropriate adjustment

board. *See Jenisio v. Ozark Airlines, Inc. Retirement Plan,* 187 F.3d 970, 974 (8th Cir.1999) (affirming district court's dismissal of claim involving minor dispute under RLA for lack of subject matter jurisdiction).

## III. *DISCUSSION*

### A. TERMINATION OF PROBATIONARY PILOTS AND FLIGHT ATTENDANTS

■ The Union contends that Chautauqua violated its collective bargaining agreements with the pilots and flight attendants when it terminated a certain percentage of them without following the procedures outlined in Article 11 of the agreements[3]. Article 11 of the pilots' agreement provides, in relevant part, as follows:

### REDUCTION IN FORCE OR FURLOUGH

A. The Company will provide at least fourteen (14) days written notice of any force surplus requiring a reduction in the number of pilots in a particular status, equipment or domicile.

B. A pilot holding an award in the surplus status, equipment or domicile will be displaced in inverse order of seniority . . .

That article then proceeds to list the various options available to displaced pilots, including the ability to displace more junior pilots. In addition, the article discusses the procedure for furloughs. At the hearing, there was evidence that Article 11 applied to all pilots, including those in their probationary periods. It is undisputed that Chautauqua did not provide advance notice of the terminations, nor did it otherwise afford the probationary pilots any of the options available under Article 11.

Chautauqua does not necessarily dispute that Article 11 could apply to probationary pilots in this type of a situation. Instead, it argues that Article 11 does not *necessarily* apply, and that Article 18 is equally applicable. Chautauqua asserts that under Article 18 of the collective bargaining agreements, it had the right to terminate probationary pilots for any reason, with or without cause. The relevant language of that article provides as follows:

Discipline and Discharge . . .

2. In the case of discipline or discharge of a probationary or non-probationary pilot, the precise charge and or actions will be reduced to writing and a copy furnished to the grievant and the Union. A probationary employee does not have the right of employing the grievance, System Board, and arbitration procedure.[4]

This article clearly precludes a probationary pilot from filing a grievance or otherwise challenging his or her discipline or discharge. According to Chautauqua,

---

3. The parties appear to agree that both the pilots and flight attendants had collective bargaining agreements that contained similar language under Article 11. In addition, both agreements contained an Article 18 that precluded probationary pilots and flight attendants from filing a grievance about their discipline and/or discharge. Because the language of both agreements is nearly identical, and because Chautauqua makes the same argument with respect to its termination of both classes of employees, the Court will refer only to the issue with respect to the probationary pilots. Its determination of that issue will also resolve the identical issue involved with the termination of the probationary flight attendants.

4. Again, the flight attendants' agreement contains an Article 18 that also precludes probationary flight attendants from filing a grievance challenging any discipline and/or discharge.

once it terminated the probationary pilots pursuant to Article 18, those pilots were no longer included on the seniority list and the provisions of Article 11 were inapplicable. The Union, on the other hand, counters that because there admittedly were no disciplinary reasons for the terminations, and the company simply had a "force surplus requiring a reduction in the number of pilots," Article 11 governs the pilots' terminations. Article 18, continues the Union, merely provides procedural guidelines for the filing of grievances; it does not afford the company any substantive rights to terminate probationary employees.

After reviewing the agreements, the Court concludes that determining which party's position is correct inevitably requires an interpretation of Article 11 and Article 18, something that this Court cannot do. District courts simply should not assess the relative merits of the parties' competing interpretations of the contract in order to find a dispute "minor." Instead, if Chautauqua's reliance upon Article 18 is not frivolous or obviously insubstantial, then the Court must dismiss the claim for lack of jurisdiction. As the Company points out in its brief, the Union's position appears to be that while Chautauqua seemingly could discharge probationary pilots without cause, it could not do so in all circumstances (*i.e.*, when it implemented a reduction in force for economic reasons). Again, discerning under what circumstances the Company could have terminated a single employee or group of employees without following Article 11 requires an interpretation of the collective bargaining agreement. In sum, Chautauqua's argument that it had the ability to terminate probationary pilots under Article 18 without resorting to the procedures outlined in Article 11 is not frivolous, nor is it obviously insubstantial. As a result, the Court finds that this is a minor dispute and **DENIES** the Union's motion for a

preliminary injunction on this issue. The Court also **DISMISSES** this claim for lack of subject matter jurisdiction. *See Jenisio,* 187 F.3d at 974.

## B. THE REDUCTION OF THE WORKWEEK FOR FLEET AND PASSENGER SERVICE AGENTS

 The parties also disagree over the characterization of the Union's dispute related to Chautauqua's reduction of the workweek of the fleet and passenger service agents. It is undisputed that Chautauqua reduced the workweek for certain full-time fleet and passenger service agents from 40 to 32 hours. At the hearing, the Union presented evidence that it was an established working condition that full-time fleet and passenger service agents be scheduled 40 hours per week, and Chautauqua presented no evidence to the contrary.

The Union contends that the dispute is major under the RLA. As already discussed, major disputes are generally limited to those disputes which arise in the absence or silence of a collective bargaining agreement. *Burlington Northern Railroad Co. v. United Transportation Union,* 862 F.2d 1266, 1271 (7th Cir.1988). Those disputes that cannot be resolved through interpretation or analysis of a collective bargaining agreement are considered major. *Id.* The statutory bases for the major dispute category are 45 U.S.C. §§ 152, Seventh, and 156. *Consolidated Rail,* 491 U.S. at 302, 109 S.Ct. 2477. The former states that no carrier shall "change the rates of pay, rules, or working conditions of its employees ... except in the manner prescribed in such agreements or in section 156 of this title." *Id.* Thus, unilateral changes to rates of pay, rules, or working conditions are major disputes. *United Transportation Union v. Cuyahoga Valley Railway Co.,* 979 F.2d 431,

434 (6th Cir.1992), *cert. denied,* 507 U.S. 1005, 113 S.Ct. 1646, 123 L.Ed.2d 268 (1993) (citing 45 U.S.C. § 152, Seventh (1988)).

Nothing in the parties' collective bargaining agreement addresses Chautauqua's ability to reduce the scheduled workweeks for full-time employees. Both parties concede that the agreement did not specifically grant Chautauqua the right to take such action, but they also agree that the agreement did not explicitly prohibit it. In its attempt to classify this dispute as minor, Chautauqua primarily relies upon Article 4 of the agreement, which is entitled "Hours of Service." [5] According to Chautauqua, Article 4 invested it with the power to schedule work, which implies that it also had the power to determine the number of hours to be worked in a week. *See Chautauqua's Brief at* 14. Chautauqua asserts that this is a non-frivolous argument that the collective bargaining agreement authorized its actions, and as result, the dispute is minor.

Even a broad reading of Article 4, however, does not support Chautauqua's contention. That article has several different subparts, none of which implicitly grants the Company the right to reduce employees' scheduled workweeks. The various provisions of Article 4 are briefly discussed below:

- Subsection A simply states that all time worked in any continuous work day shall be considered work performed on the calendar day the work was started.
- Subsection B concerns the posting of work schedules and the procedures for bidding on them.

- Subsection C deals with the trading or swapping of shift assignments or days off.
- Subsection D concerns meal periods.
- Subsection E discusses the appropriate amount of rest between shifts.
- Subsection F concerns pay rates for transferred and reclassified employees.
- Subsection G deals with the company's ability to schedule work when acts beyond its control occur.
- Subsection H concerns situations where management personnel will be scheduled to work and perform similar duties to those performed by covered personnel.
- Subsection I deals with the company's ability to schedule split shifts.

The Court is aware of the Seventh Circuit's past admonition that in close cases, a court should construe a dispute as minor. *See Railway Labor Executives Ass'n v. Norfolk and W. Ry. Co.,* 833 F.2d 700, 705 (7th Cir.1987) ("Because a major dispute can escalate into a strike, if there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor."). The Court is also aware that a dispute is minor "unless the carrier's claims of contractual justification are 'frivolous' or 'obviously insubstantial.' The court does not consider the merits of the underlying dispute; its role is limited to determining whether the dispute can be characterized as involving the proper application or meaning of a contract provision." *Burlington Northern,* 862 F.2d at 1272–1273 (citations omitted). After reviewing Article 4, however, the Court concludes that it cannot fairly be read to have

---

**5.** Chautauqua also relied upon Article 26 of the agreement and a side letter agreement with the Union for support of its position that this dispute is minor. Article 26 applies only to part-time employees, however, and the company has not explained how it somehow

granted it the ability to reduce the workweek of full-time employees. The Court also fails to see how the letter agreement with the Union gave it such authority. Accordingly, the Court will only consider Article 4 of the collective bargaining agreement in its analysis.

implicitly authorized Chautauqua's actions. Indeed, while Article 4 generally deals with hours of service, it simply does not address the company's ability to reduce the scheduled workweek of full-time employees. Because Chautauqua's claim of contractual justification cannot be found within the contract language, its claim must be termed insubstantial. The Union's claim concerns a major dispute. As a result, Chautauqua was required to comply with the RLA's procedures for resolving major disputes, which it failed to do.

■ The Court finds that a preliminary injunction is in order on this claim. The Union has established a reasonable likelihood of success on the merits, and there appears to be no adequate remedy at law. The Union was not required to show irreparable injury, because federal courts enjoin a violation of the status quo pending completion of the required procedures without this customary showing. *See Consolidated Rail,* 491 U.S. at 302, 109 S.Ct. 2477. It appears that the Union will suffer harm if the Court denies it relief, and that the Company will be harmed if the Court grants an injunction. Accordingly, that factor does not tip the scales in either direction. Finally, the issuance of such an injunction will not harm the public interest. Accordingly, the Court thus **GRANTS** the Union's motion for a preliminary injunction on this issue, and enjoins Chautauqua from changing the established scheduled workweek for full-time fleet and passenger service agents until it exhausts the appropriate dispute resolution procedures set forth in the RLA. It also orders Chautauqua to restore the status quo with respect to those working conditions.

## C. CHAUTAUQUA'S REFUSAL TO PARTICIPATE IN NMB–SPONSORED MEDIATION

■ Finally, the Union contends that Chautauqua violated the RLA when it refused to participate in mediation sponsored by the NMB. As already discussed, the parties had agreed in November 2000 to engage in interest-based bargaining regarding changes to the pilots' agreement. The parties eventually came up with a tentative agreement in July 2001, and submitted it to the pilots for approval on August 1, 2001. On August 30, 2001, the pilots resoundingly rejected the tentative agreement by a vote of 239 to 35. The collective bargaining agreement provided that the parties could exchange § 6 notices, which serve to open collective bargaining for a revised agreement, between approximately July 17 and August 17, 2001. At the hearing, Ernest E. Sowell ("Sowell"), General Counsel for and Secretary–Treasurer of Local 747, testified that he determined for strategic reasons not to serve any § 6 notice during the required time period, which also happened to be the time period during which the pilots were considering the tentative agreement. Sowell did not serve the notice because he felt that doing so would somehow interfere with the approval process.

■ Under the RLA, when a collective bargaining agreement is about to expire and one party desires changes in its terms, that party must serve notice of those proposed changes on the other party under § 6, 45 U.S.C. § 156. The dispute is then subject to mediation under the auspices of the NMB. *Pan American World Airways, Inc. v. International Brotherhood of Teamsters,* 894 F.2d 36, 38 (2nd Cir.1990). After the pilots rejected the tentative agreement, the Union submitted the parties' bargaining dispute to the NMB for assistance in mediation services. *Sowell Dec.* ¶ 8. Chautauqua refused to participate in such mediation because the Union never served it with the required § 6 notice. The Union does not dispute that it failed to serve the notice; instead, it claims that Chautauqua waived its right to insist on such notice. According to the Union, because it had been bargaining with the

company for a period of time—and actually came up with a tentative agreement—Chautauqua was on notice of the changes the Union wanted to the agreement. Therefore, according to the Union, it should have been relieved of its obligation to serve § 6 notice prior to submitting the matter to the NMB.[6]

The cases the Union relies upon in support of its argument that Chautauqua waived its right to insist upon § 6 notice are distinguishable. For example, in *Flight Engineers International Ass'n v. Eastern Air Lines, Inc.,* 208 F.Supp. 182 (S.D.N.Y.1962), *aff'd.* 307 F.2d 510 (2nd Cir.1962), *cert. denied,* 372 U.S. 945, 83 S.Ct. 934, 9 L.Ed.2d 970 (1963), the parties had both served § 6 notices outlining in general terms their proposed changes to the collective bargaining agreement. The parties then submitted their dispute to the NMB, and during that mediation issues outside the § 6 notices were discussed. Nonetheless, the parties continued negotiations under the auspices of the NMB for over a year. When they could not resolve the issues, the union served the company with written strike notice. President Kennedy then appointed an Emergency Board to investigate certain unadjusted disputes between the parties. The parties still were unable to resolve the dispute, which led to the union's going on strike and then litigation.

The union contended that because the carrier had not served it with § 6 notice over particular issues, it could not unilaterally change the status quo. The district court noted, however, that even if there had been a technical deficiency in the no-

tice, that could not "mask the fact that these issues have been a subject of negotiation since February 1961, and as to them, the processes of the Act have been exhausted." *Id.* at 190. In addition, because the purposes of the Act had been filled, they could not have been implemented further by subsequent service of a new § 6 notice. The court then noted that it could be argued that the union waived any argument with respect to a technical deficiency with the notice by its extensive participation in negotiation and mediation proceedings, during which those issues that were not included in the § 6 notices had been thoroughly discussed. *Id.* at 191.

In contrast, the Union in this matter *never* served a § 6 notice on Chautauqua. Thus, there is no issue here about a technical deficiency in the notice—like the notice in *Flight Engineers*—because there was no notice. In addition, the parties in *Flight Engineers* had engaged in extensive negotiations and mediation under the auspices of the NMB. They had completely exhausted the processes of the RLA. Their situation stands in stark contrast to the facts in this case, where the parties simply engaged in interest-based bargaining and have yet to even meet with the NMB. As a result, the Court finds the Union's reliance on *Flight Engineers* to be unpersuasive.

Similarly, the Union's reliance on *Childers v. Brotherhood of R. Trainmen,* 192 F.2d 956 (8th Cir.1951), is misplaced. The facts of that case need not be discussed in detail, because the Eighth Circuit found that the district court had correctly held that the 30 day notice provided for in the statute did not apply to the facts in that

---

**6.** Chautauqua claims that this dispute is minor because to determine whether it waived its right to insist upon § 6 notice, the Court must interpret Article 25 of the collective bargaining agreement. The Union disagrees, arguing that there is no dispute about the language of Article 25. Instead, according to the Union, the only issue is whether Chautauqua waived its right to insist upon such notice, which is a purely factual determination. The Court agrees with the Union's position. The language of Article 25 is clear and its meaning undisputed. As a result, there is no need for the Court to interpret it in determining whether Chautauqua waived its right to insist upon such notice.

case. *Id.* at 960. Finally, the Union cites to *Pullman Company v. Order of Ry. Conductors and Brakemen,* 316 F.2d 556 (7th Cir.), *cert. denied,* 375 U.S. 820, 84 S.Ct. 57, 11 L.Ed.2d 54 (1963). Again in *Pullman,* however, the issue concerned the sufficiency of the union's § 6 notice. In that case, the parties had served § 6 notices and engaged in negotiation and mediation with the NMB. An Emergency Board later reviewed the issues and issued a recommendation outlining the proper direction future negotiations should take in finding a solution to the job security problem. *Id.* at 561. In an effort to comply with the Emergency Board's recommendation, the union submitted a new proposal to the company. The company objected to that proposal, claiming that it was merely informal and not embodied within a § 6 notice as required by the RLA. *Id.* The Seventh Circuit disagreed, and found that the union's earlier § 6 notice was sufficient to put the company on notice of the proposed changes. *Id.* at 562. Thus, *Pullman* is also distinguishable from this matter because it, too, dealt with the sufficiency of a § 6 notice.

The Union has provided the Court with no decision of any federal court holding that, where the § 6 notice requirement was applicable, a company had completely waived its right to insist upon it. After reviewing the facts of this case, the Court concludes that Chautauqua did not waive its right to insist upon § 6 notice. Although it had engaged in interest-based bargaining with the Union for several months prior to the 30–day window when § 6 notices were to be served, there is no evidence that it ever indicated to the Union that such negotiations would substitute for formal § 6 notice. Indeed, Sowell admitted that he was aware that the collective bargaining agreement required any § 6 notice to be served during July 17 to August 17 of 2001, but that he declined to exercise that right for strategic reasons.

He did not testify that anyone from Chautauqua ever told him or even hinted that because the pilots were considering the tentative agreement during that time frame, that the Company would excuse the Union from serving the statutory notice. This is simply a case where the Union, for admittedly strategic reasons, determined not to serve § 6 notice. Because it failed to do so, Chautauqua's failure to participate in mediation with the NMB was not unlawful. Accordingly, the Court **DENIES** the Union's motion for a preliminary injunction on this matter.

### IV. *CONCLUSION*

The Court now enters the following order:

(1) The Court **GRANTS** the Union's motion for a preliminary injunction with respect to Chautauqua's reduction of certain fleet and passenger service agents' workweeks. The Court orders Chautauqua to restore the status quo with respect to the scheduled workweeks for full-time fleet and passenger service agents at the facilities located in Evansville, Indiana, and in Lancaster and Altoona, Pennsylvania. The Court further enjoins Chautauqua from altering those working conditions until it has exhausted the appropriate procedures.

(2) The Court **DISMISSES** the Union's claim regarding the termination of the probationary pilots and flight attendants for lack of subject matter jurisdiction. This dispute is a minor dispute under the RLA and must be resolved with the appropriate adjustment board.

(3) The Court **DISMISSES** the Union's claim regarding Chautauqua's alleged failure to allow pilots to exchange paid days off for pay. The parties agree that this issue has become moot.

(4) The Court **DENIES** the Union's motion for a preliminary injunction with respect to its claim that Chautauqua unlawfully failed to participate in NMB-sponsored mediation. The Union failed to serve § 6 notice on Chautauqua, and there is no evidence that Chautauqua waived its right to insist upon such notice.

Finally, the Court sets this matter for a hearing on the issuance of a permanent injunction with respect to Chautauqua's reduction in the workweek hours for the full-time fleet and passenger service agents at the facilities located in Evansville, Indiana, and Altoona and Lancaster, Pennsylvania. That hearing is scheduled for Wednesday, January 23, 2002, at 9:00 a.m. (EST), Courtroom 202, U.S. District Courthouse, 46 E. Ohio Street, Indianapolis, Indiana.

IT IS SO ORDERED this ____ day of December, 2001.