**RAILWAY EXPRESS AGENCY, INCORPORATED, Plaintiff-Appellee,**

v.

**BROTHERHOOD OF RAILWAY, AIRLINE AND STEAMSHIP CLERKS, FREIGHT HANDLERS et al., Defendants-Appellants.**

No. 29256.

United States Court of Appeals,
Fifth Circuit.

Jan. 25, 1971.

---

9. 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964).

10. Moreno-Vallejo v. United States, 414 F.2d 901, 904 (5th Cir. 1969).

Carole A. Gardiner, Neal P. Rutledge, and Thomas W. McAliley, Beckham & McAliley, Miami, Fla., for defendants-appellants.

Arthur M. Wisehart, Gen. Counsel, New York City, and Charles Kelso of Fisher & Phillips, Atlanta, Ga., for plaintiff-appellee.

Before BELL, THORNBERRY and CLARK, Circuit Judges.

BELL, Circuit Judge:

This appeal by defendant-local unions presents questions arising from the entry of a permanent injunction against the further picketing of the employer-Railway Express Agency (REA) by defendants. The basic question is whether the dispute underlying the suit is major or minor as those terms are used in the Railway Labor Act, 45 U.S.C.A. § 151 et seq. With respect to these questions, the international union from the begin-

ning has agreed with REA that the dispute is minor and for resolution by a Special Board of Adjustment under the Act. Other questions for consideration have to do with the propriety and scope of the injunction aside from the major-minor dichotomy. We affirm.

REA, a nationwide express agency, is a "carrier" engaged in interstate commerce within the meaning of the Railway Labor Act. Appellants are local unions and their officers, who are named as defendants both in their individual and official capacities and as representatives of the classes of REA employees against whom this suit is brought. They are affiliated with the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees (BRAC), an international union which is the exclusive bargaining agent for REA employees.[1] The union contract covering the employees here involved are those into which REA and BRAC entered. There is no contract between REA and the appellant-local unions.

The dispute between REA and appellants had its genesis in a change in work assignment at the Atlanta Airport. On June 1, 1969, REA by agreement with Delta Air Lines contracted out to Delta a portion of REA's air express transfer work which REA's employees had previously handled at Atlanta Airport. This change was instituted unilaterally without any advance notice to the union and without giving the union any opportunity to confer or negotiate with management.

REA maintains a field office or operation at the Atlanta Airport as it does at most major airports for the transfer of air express from one flight to another. Prior to June 1, 1969, REA employees handled all transfers between flights through the REA facility, with the exception of "ramp transfers"—a procedure by which airline employees handled very limited emergency transfers involving medicines, blood and the like. In late May, REA offered the airlines the opportunity to transfer routine express between their own flights using their own employees if the flight was to leave the Atlanta Airport within three hours. The purpose of the offer, according to REA, was to decrease the long delay in express processing which frequently occurred at the airport. Delta accepted the offer and the change was implemented on June 1, 1969. The same offer was declined by the other airlines at the Atlanta Airport.

There are three factual issues involved but, as will be seen, their resolution is unnecessary to our decision. One factual dispute is over the magnitude of the change from the standpoint of REA employees. REA says that the change transferred out fourteen per cent of the total volume of the express transfer work and that no jobs had been terminated due to the change. If all airlines accepted REA's proposal, an additional ten per cent of the air express would be transferred out of the REA terminal. Defendants say REA's action transferred out between thirty and forty per cent of the transfer work and that one job had been abolished. It does appear that this amount is all of the Delta express handled at the airport but, nevertheless, we deem that defendants take the position that something more is involved than what REA claims; hence a factual dispute. Also, there is a dispute about the precise nature of the change. REA says it farmed out to Delta only intraline transfers that could arrive on one Delta flight and go out on another within three hours. Defendants say that Delta employees handle all or most of its intraline transfers without regard to the three-hour limitation.

A third factual dispute relates to the past history of REA's farming out of work as it did on June 1, and is not really a dispute. REA claims to have contracted out such work at other airports without notice to, or complaint from, the union in the past. In support of this

---

1. BRAC, an original defendant was dismissed by stipulation and is not an appellant here.

contention, REA cites several instances in which transfer procedures similar to those now followed by Delta have been implemented at other airports throughout the country. Appellants' evidence indicates that REA has never before farmed out such work in the five-state Gulf District without prior union agreement or notice. REA does not dispute this contention, but instead relies upon information concerning airports outside of the Gulf District.

At any rate the local REA employees were dissatisfied with the change and they engaged in a two-hour work stoppage on June 6. This stoppage ended voluntarily. Between June 6 and June 16, union officials discussed the matter with REA on several occasions, but no agreement could be reached. On June 16, picketing started in Atlanta, and a work stoppage ensued. Similar action later occurred at other southern cities. BRAC, (the international) viewed the dispute as minor and instructed the locals to discontinue the picketing, but it nevertheless continued. BRAC also notified the locals that REA would expedite the handling of the grievance by the Special Board of Adjustment which had been created by the contract. No grievance was filed by the locals, however, since they did not consider the dispute to be minor.

On June 25, REA instituted an action for injunctive relief in the district court, seeking to enjoin the picketing and work stoppage. A temporary restraining order, issued on that date, was continued indefinitely on July 22 following a hearing. This hearing did not include testimony by witnesses. The issues were narrowed by counsel and some of the facts were stipulated as being undisputed. Affidavits and briefs were thereafter filed. It was agreed that the major-minor issue would be determined as a question of law on the undisputed facts if at all possible.

REA contends that the dispute arose out of the interpretation or application of agreements between REA and BRAC, and that it was a minor dispute within the meaning of the Railway Labor Act. It was the position of the local unions that the contracting or farming out of work which is within the scope of an existing contract gives rise to a major dispute under the Railway Labor Act, and that such was the case here. In addition, since action of such magnitude was taken by REA unilaterally, the locals were entitled to an injunction restoring the status quo ante. In any event, the locals asserted, since REA failed to discuss the matter in advance of acting, even if a minor dispute, the status quo ante should be restored. On December 8, 1969, the previously issued order was continued as a permanent injunction, "to protect the jurisdiction of the Special Adjustment Board which has jurisdiction of this dispute."

I.

We turn first to the issue whether the dispute between the parties was "major" or "minor" in the parlance of the Railway Labor Act. In Brotherhood of Locomotive Firemen and Enginemen v. Florida East Coast Ry. Co., 5 Cir., 1965, 346 F.2d 673, we said:

"Under the Railway Labor Act, minor disputes involve grievances or questions of interpretation of an existing collective bargaining contract; major disputes arise from efforts to change working conditions through the making of a new agreement." 346 F.2d at 676.

In making that statement, we, as was the case with the district court, here, relied on Elgin, Joliet & Eastern Ry. Co. v. Burley, 1945, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886, where the Supreme Court set out the rationale of the Act as it relates to the handling of disputes between management and labor. Major disputes must be resolved under the procedures set forth in § 6 of the Act, 45 U.S.C.A. § 156. There must be notices of intended changes, negotiations, possible mediation by the National Mediation Board. All of these procedures must be

exhausted before the employer may implement the intended changes and before the union is free to strike. Minor disputes, on the other hand, are for arbitration before the National Railroad Adjustment Board or before a Special Adjustment Board established by the parties.[2] The Act provides for compulsory arbitration of all minor disputes and prohibits all strikes over minor disputes. Brotherhood of Railway Trainmen v. Chicago River & Ind. Ry. Co., 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed. 2d 622.

The dispute here narrows as follows. Appellants contend that REA contracted out "scope work" in violation of the agreement between REA and BRAC. The argument is that the employees of REA have always performed the air express transfer work at the Atlanta Airport. Thus, although not explicitly mentioned in the agreement, it is within the scope of the agreement and may not be transferred to others. To support this contention, appellants rely on past practices at the Atlanta Airport. The difficulty is that there is no mention whatever of any particular work assignment in the agreement.

REA, on the other hand, contends that it did not violate the scope clause of the agreement by unilaterally permitting Delta to make certain ramp transfers and thus did not violate the contract. REA relies primarily on past practices at other airports to support its interpretation of the scope clause. These practices were that REA contracted with airlines to make ramp transfers of freight on many occasions at these other airports although never before at the Atlanta Airport. The mode of transferring express, whether by REA or the airlines, was a continuing subject of negotiation between REA and the airlines in the interest of rendering efficient service to the public. REA also relies

on the management prerogatives clause, which preserves "the right of management to determine methods of operation and the utilization of the working forces * * *."

We are not impressed by the argument that the scope of the agreement must be implied from past practices at the Atlanta Airport rather than nationwide. The agreement here is a nationwide agreement, covering employees in an industry of peculiarly national character. Therefore, the implied terms of the agreement must be found by looking to the work traditionally performed by REA employees on a national rather than on a local level. It is undisputed that the past practices on the national level has been for management to make air express transfer changes of the type here involved unilaterally.

The dispute in reality is over the breadth of management's prerogative. There are no provisions in the agreement which expressly reserve the work in question to REA employees. Likewise, there is no express provision allowing management to transfer the work unilaterally. However, the agreement does expressly reserve "the right of management to determine methods of operation and the utilization of the working forces * * *." Moreover, there is an undisputed history of such unilateral transfers of work with no apparent objection from the union. It may be concluded, as the district court did conclude, that this state of facts gave REA at least the arguable right to make the transfer to Delta. Whether it actually has such a right must be determined by the Special Adjustment Board.

We also conclude, for the purpose of defining the extent of which a federal court may intervene in a railway labor dispute and enjoin a strike, that the dispute here is a minor one involv-

2. Section 2, Sixth of the Act, 45 U.S.C.A. § 152, is directed to minor disputes in the following language:
"Sixth. In case of a dispute * * * arising out of grievances or out of the

interpretation or application of agreements concerning rates of pay, rules, or working conditions * * * "

ing the interpretation of existing agreements. This position receives substantial support from the case of Rutland Railway Corp. v. Bro. of Locomotive Engineers, 307 F.2d 21 (2d Cir. 1962), cert. denied, 1963, 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978, which involved management's prerogative to unilaterally reschedule train runs where there was to be a resultant loss in employment. The court there determined that the dispute fell into the minor category although the agreement between the parties contained no express provision covering the subject. See also Missouri-K.-T. RR v. Bro. of Locomotive Engineers, 5 Cir., 1959, 266 F.2d 335, rev. on other grounds, 1960, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379; In Matter of Hudson & M. R. R., S.D.N.Y., 1959, 172 F.Supp. 329, aff'd sub nom. Stichman v. General Grievance Committee, 2 Cir., 1959, 267 F.2d 941.

Also, it is significant that BRAC (the international) agrees that the dispute is minor. BRAC President Dennis wired appellants stating that the dispute was not a strikeable one, that REA had agreed to expedite the matter to the Special Board of Adjustment, and that the strikers should immediately return to work. This position buttresses the decision that the dispute is minor when considered in light of the fact that BRAC is the certified statutory bargaining agent.

We are not inclined to view this matter as analogous to cases where the bargaining unit is eliminated in whole or substantial part. Cf. Fibreboard Paper Prod. Corp. v. NLRB, 1964, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233; United Indus. Wkrs. of Seafarers, etc. v. Bd. of Trustees of Galveston Wharves, 5 Cir., 1965, 351 F.2d 183.

Since the dispute was minor, it follows from the *Chicago-River* case, supra,

that the district court had the power to enjoin appellants.

## II.

The next question is whether, considering the circumstances, REA was entitled to an injunction. Appellants contend that REA did not comply with the requirements of § 8 of the Norris-LaGuardia Act. 29 U.S.C.A. § 108.[3] This "clean hands" section provides that no injunction shall be granted to any complainant who has failed to comply with any obligation imposed by law or who has failed to make every reasonable effort to settle the dispute by negotiation or otherwise.

It is undisputed that REA did not confer with the union before instituting the change in dispute. Appellants' position is that a strike pursuant to a minor dispute (while not conceding that the dispute is minor) is not enjoinable where the employer failed to confer with employees prior to instituting the change from which the dispute arises. REA argues that the clean hands provision does not bar injunctive relief as long as they conferred with the union before seeking an injunction, not necessarily before instituting the change. Since both parties rely on *Rutland*, supra, it is necessary to examine that decision.

In *Rutland*, the Second Circuit carefully examined the duty to confer imposed on disputing parties by § 8 of Norris-LaGuardia and by § 2, First, Second and Sixth of the Railway Labor Act. Section 2 First and Second, place a duty on both parties to the dispute to make every reasonable effort to settle the matter, major or minor, and as part of their efforts, to confer over their differences. Section 2 Sixth, promulgates a procedure for calling a conference after request to discuss a minor dispute.

3. 29 U.S.C.A. § 108:

"No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."

All of this is to occur before submission of the dispute to the Railroad Adjustment Board. Section 8 of Norris-La-Guardia was enacted subsequent to the Railway Labor Act, and provides that an injunction cannot be obtained by one who has not complied with any obligation imposed by law or has not made every reasonable effort to settle the dispute by negotiation. The court in *Rutland* held that the duty to negotiate, in the context of a minor dispute, does not mean that the employer must negotiate with the union prior to instituting changes in train runs. Whether there should be full scale negotiation is for the Adjustment Board to decide. The duty on the employer was analyzed as follows:

"But in minor disputes involving the scope of the managerial prerogative it must be that Section 2 First, Second and Sixth of the Railway Labor Act together with the Norris-La-Guardia Act impose some lesser duty on a railroad which seeks injunctive relief. * * * Therefore, we hold that the relevant sections * * * impose a duty upon the railroad, short of negotiation, to take some reasonable steps toward dispute settlement before it can obtain an anti-strike injunction. These lesser efforts are comprehended within the concept of "conferring." Rutland Railway Corp. v. Bro. of Locomotive Engineers, 307 F.2d 21, 40 (2d Cir. 1962).

The court went on to define conferring as basically a getting together with a sincere effort to resolve their differences, with each side explaining its position and listening to the contentions of the other side. Since the district below in *Rutland* did not make a finding that the railroad made reasonable efforts to settle the dispute in conference, the injunction was dissolved and the case remanded to determine whether the employer had conferred.

■ In sum, *Rutland* makes it clear that the requirement to attempt to settle disputes is not a requirement to bargain with the union before making changes which lead to a minor dispute. Like *Rutland*, the instant case involves a minor dispute over the scope of the managerial prerogative, in which management has the duty to confer with the union over the dispute before it is entitled to an anti-strike injunction. Unlike the *Rutland* case, however, the district court here made sufficient findings to demonstrate good faith conferring. The record amply supports this view. There was no failure on the part of REA to comply with the statutory prerequisites to an anti-strike injunction.

### III.

■ Appellants also contend that any injunctive relief afforded REA should be conditioned upon restoring the status quo ante. In Missouri-K.-T. RR v. Bro. of Locomotive Engineers, 1960, 363 U.S. 525, 80 S.Ct. 1326, 4 L.Ed.2d 1379, the Supreme Court held that in a minor dispute situation, while the statutes say nothing about restoration of the status quo ante, such status quo may be maintained by freezing the conditions sought to be changed by the carrier or by allowing the change but requiring the employer to continue paying the affected employees. Such relief by way of conditions is addressed to the district court's equitable discretion, the exercise of which is reviewable only for abuse of that discretion.

■ In the instant case, the district court in its final order did not grant, or even mention, appellants' request for a restoration of the status quo ante. At the July 22 hearing, however, and in a July 25 interim order, the district court made it clear that its discretionary powers in this area were understood and that it was prepared to exercise it if any subsequent change had a substantial adverse affect upon the employees. We find no abuse of discretion in the district court's declining to condition issuance of an injunction upon restoration of the status quo ante. See generally United Ind. Wkrs. of Sea. I. U. of North

America, Atlantic Gulf Lakes, and Inland Waters, District, Marine Allied Workers Division, AFL–CIO v. Bd. of Trustees of Galveston Wharves, 5 Cir., 1968; 400 F.2d 320.

## IV.

This leaves one final question for decision: whether the district court complied with statutory procedural prerequisites to granting the injunction:

On July 22, 1969 a hearing was held to determine whether a preliminary injunction should be granted. As noted, no witnesses were heard, but the parties stated their positions and stipulated as to some undisputed facts. Briefs and affidavits were to be and were filed later. There were remaining factual disputes after the affidavits were filed. Appellants assert that such a procedure was a patent violation of § 7 of the Norris-LaGuardia Act, 29 U.S.C.A. § 107, which provides:

> "No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute * * * except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered. * * *"

REA's position is one, that appellants waived the taking of oral testimony, and two, that the resolution of all factual disputes in favor of the unions would not indicate a different result on the injunction question.

In Missouri-K.-T. RR v. Bro. of Locomotive Engineers, 5 Cir., 1959, supra, this court was faced with a similar problem, except that there the district court did not make findings of fact as required by § 9 of Norris-LaGuardia, 29 U.S.C.A. § 109. The court held, however, that since the material facts were admitted (i. e. the strike, the matters in controversy though not their legal effect, and the submission of the contro-

versies to the appropriate Boards), the specific provisions of the Railway Labor Act took precedence over the general provision of Norris-LaGuardia. Therefore, strict compliance with § 7 was not required.

 Here the crucial facts were stipulated by counsel. There was no dispute as to the picketing, what it was about, or the applicable agreements. The remaining factual disputes concern the effect of the dispute on the number of jobs and the precise nature of the change as implemented. The resolution of both these disputes in favor of the appellants would not change the nature of the controversy—a non-strikeable minor dispute. Added to the above is the fact that appellants appear to have waived oral testimony by witnesses if the only issue remaining was a legal one in light of the undisputed facts. We hold this to be the case. There was no violation of § 7 of the Norris-LaGuardia under these limited circumstances.

Affirmed.