**BNSF RAILWAY COMPANY**

v.

**BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN, a Division of the Rail Conference of the International Brotherhood of Teamsters**

v.

**United Transportation Union.**

**Civil No. 4:07–CV–274–Y.**

United States District Court,
N.D. Texas,
Fort Worth Division.

Nov. 12, 2008.

As Amended Jan. 16, 2009.

724

David M. Pryor, Carolyn Ritchie, Fort Worth, TX, for BNSF Railway Company.

Clinton J. Miller, III, Daniel R. Elliott, III, Cleveland, OH, Sanford R. Denison, Baab & Denison, Dallas, TX, for United Transportation Union.

*ORDER GRANTING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT*

TERRY R. MEANS, District Judge.

Pending before the Court are the summary judgment motions of plaintiff BNSF Railway Company ("BNSF") [doc. # 35] and defendant United Transportation Union ("UTU") [doc. # 32] and the motion for partial summary judgment of intervenor Brotherhood of Locomotive Engineers and Trainmen ("BLET") [doc. # 37]. The Court concludes that BNSF's claim that this case can be resolved by interpreting existing agreements is arguably justified. As a result, this case involves a minor dispute and is subject to mandatory arbitration under the Railway Labor Act. Therefore, BNSF's motion for summary judgment is GRANTED and the motions for summary judgment by BLET and UTU are DENIED.

## I. Background

As railway carriers developed new technology that reduced the number of employees needed to operate a locomotive, disputes developed between some carriers and their employees' unions. The facts specific to this case are agreed. BNSF is an interstate railroad carrier. As part of its operations, BNSF employs both engineers and ground-service employees. Rather than negotiate employment-related issues with these groups' unions directly, BNSF is a member of the National Carrier's Conference Committee ("NCCC"). The NCCC negotiates with railroad employee labor organizations on behalf of its member carriers, including BNSF.

Defendant UTU is the exclusive bargaining representative for BNSF ground-service employees. Intervenor BLET is the exclusive bargaining representative of engineers employed by BNSF. At issue in this case is whether the engineers represented by BLET or certain ground-service employees represented by UTU have the authority to use remote-control-operation ("RCO") technology to control the movement of locomotives between train yards or terminals or similar points of departure and destination.

This is not the first dispute arising from attempts by NCCC carriers to employ this new technology because it has prompted BNSF and other national carriers to secure consolidation and reduction in employment through changes to their collective-bargaining agreements ("CBA") with unions such as UTU. Here, after being served with notices under Section 6 of the Railway Labor Act by BNSF, UTU obtained court-ordered declaratory relief that crew staffing or "consist" is not subject to national collective bargaining. *See United Transp. Union v. Alton & Southern Ry. Co.*, No. Civ. 05–190–GPM, 2006 WL 664181, at *6 (S.D.Ill. March 10, 2006). In response, the NCCC carriers proposed a wage freeze for employees then represented by UTU and a wage reduction for employees hired after the commencement of a new CBA. *See BNSF Ry. Co. v. United Transp. Union*, 462 F.Supp.2d 746, 750 (S.D.Tex.2006). The NCCC carriers sought declaratory and injunctive relief, arguing that UTU has a policy of unlawfully striking without notice, pointing to a strike conducted by UTU in April 2005. *See id.* at 751–52, 762–65; *see also United Transp. Union v. BNSF Ry. Co.*, N. 05–cv–836 (S.D.Minn. May 16, 2005) (litigation arising out of the April 2005 strike). The United States District Court for the Southern District of Texas entered summary judgment in favor of UTU, finding no violation of the RLA in UTU's striking practices and concluding that an injunction was

not appropriate under the circumstances. *See id.* at 759–65.

A review of the historical roles of the employees represented will assist in understanding the dispute in this case. Traditionally, locomotives have been operated by engineers through the manipulation of the locomotives' brakes and throttle. Engineers have historically had exclusive control over the locomotives on long runs between points of departure and destination, known as "road service." Once inside a terminal or train yard, while the locomotives are moving at slower speeds, ground-service employees ("groundsmen") have controlled the movement of the locomotives. Groundsmen gave the engineer hand signals and voice commands by radio and the engineer operated the locomotives according to these prompts.

Over the course of the last several years, however, BNSF has begun to make use of RCO. RCO, as implemented by BNSF, allows locomotives to be operated remotely by sending commands to a computer installed inside the locomotives. Initially BNSF made use of RCO only in and around terminals and train yards, also known as "switching limits." The issue of which group of employees had the exclusive right to control the locomotives by RCO within switching limits was decided in separate litigation and a related arbitration. *See generally Burlington N. & Santa Fe Rwy. Co. v. Bhd. of Locomotive Eng'rs*, No. 01 C 7743, 2002 U.S. Dist. LEXIS 1249 (N.D.Ill.2002); *see also* [BNSF Motion App. at 12–53 (arbitrator's award) ]. BNSF has since extended its use of RCO to locomotives in road service and this case centers on the dispute over which group of employees will operate the locomotives by RCO in that circumstance.

In August 2002 an agreement was reached between the NCCC and UTU ("the 2002 Agreement"). The initial paragraph of the 2002 Agreement provides:

THIS AGREEMENT, made this 20th day of August, 2002, by and between each of the carriers listed in Exhibit A [including BNSF] ... and the employees of such carriers shown thereon and represented by the United Transportation Union, regarding each such carrier's implementation and utilization of remote control technology for assignments including, but not limited to, yard engines, road switchers, locals and other comparable assignments, witnesseth ..."

[BNSF Motion App. at 6]. A September 2001 letter of intent regarding the agreement between UTU and BNSF tracks this language, and further provides "operation of remote control technology pursuant to this Letter with respect to assignments covered hereunder will be assigned to employees represented by the United Transportation Union." [UTU Motion App. at 11].

Prior to the 2002 Agreement, BLET threatened to strike against NCCC carriers, including BNSF, if ground-service employees were assigned RCO within switching limits. *See Burlington N. & Santa Fe Rwy. Co.*, 2002 U.S. Dist. LEXIS 1249, at *4. BLET argued that engineers had the exclusive authority to operate locomotives. *See id.* The United States District Court for the Northern District of Illinois enjoined BLET from striking and concluded that the dispute between BLET and the NCCC carriers was a "minor dispute" under the Railway Labor Act ("RLA") and, therefore, subject to the act's arbitration provisions. *See id.* at *26. In the subsequent three-way arbitration between BLET, UTU, and the carriers, the arbitrator determined that assigning RCO to UTU-represented ground-service employees did not infringe upon traditional engi-

neer duties. [*See* BNSF Motion App. at 41–42].

In April 2007, BNSF and BLET entered into an agreement (the 2007 Agreement). The article defining the scope of the 2007 Agreement provides in relevant part:

1. (a) On any job or assignment in any class of road service, a BNSF locomotive engineer will operate every conventional (on-board, fixed control) and every non-conventional (remote control) locomotive or form of motive power used in assigned or unassigned service, whether such operation requires the use of conventional controls or any human control of any other operating equipment or system of controls. On any job or assignment in any class of road service, a locomotive engineer will be assigned use of any remote control locomotive equipment deployed by the company, provided such assignment would not preclude use of remote control equipment by others in addition to the engineer.

(b) On any job or assignment in any class of road service, a BNSF locomotive engineer will operate any on-rail equipment that may come into use in the future, when such operation requires any human operation or control, conventional or otherwise.

(c) If operation of the train or locomotive or other on-rail equipment in any class of road service calls for any on-board human presence (e.g., an "attendant," "overrider" or "lookout"), then a BNSF locomotive engineer will perform that function on that train, locomotive, or other on-rail equipment.

(d) If, in any form of on-rail road service, no onboard presence is required, but any human remote control operation occurs, even from a distant, fixed location, then such human operation of remote control will be performed by a BNSF locomotive engineer, provided such operation is not wholly incidental to another employee's duties (e.g., a dispatcher's).

[BNSF Motion App. at 55–56].

On May 7, 2007, BNSF filed its complaint in this Court seeking declaratory and injunctive relief against UTU. Noting that UTU had argued, in a suit it filed against another NCCC carrier, that the 2007 Agreement was invalid and created a major dispute, BNSF requests an injunction preventing UTU from striking. *See* BNSF First Amend. Comp. at ¶ 16; *see also generally United Transp. Union v. CSX Transp.*, No. 1:07–CV–1549, 2008 WL 5210761 (N.D.Ohio July 10, 2008) (previous suit filed by UTU). BNSF also seeks a declaration that the controversy in this case is a "minor dispute" as defined by the Supreme Court in cases such as *Elgin, Joliet & Eastern Railway Company v. Burley*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945) and *Consolidated Rail Corporation v. Railway Labor Executives' Association*, 491 U.S. 299, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989).

BLET then filed its complaint as an intervenor against UTU and a cross claim against BNSF. Therein, BLET claims that BNSF's attempt to assign RCO duties to anyone but engineers represented by BLET is a violation of the RLA because the language from the 2007 Agreement quoted above gives BLET engineers the exclusive authority to engage in RCO for BNSF. BLET further argues that UTU, by asserting that the 2007 Agreement is invalid and by threatening to strike, is interfering, in violation of the RLA, with BLET's agreement with BNSF. BLET requests that UTU be enjoined from engaging in such interference and that BLET be made a full party to any arbitration under Section 3 of the RLA involving the meaning of the 2007 Agreement.

UTU answered and counterclaimed in July 2007. UTU argues that the language quoted above from the 2002 Agreement gives UTU represented groundsmen the exclusive authority to engage in RCO for BNSF. Further, UTU argues that the 2007 Agreement is an invalid attempt by BNSF to alter the terms the 2002 Agreement, that such attempted alteration is a violation of the RLA, and that the resulting dispute is a major dispute entitling UTU to both declaratory and injunctive relief.

All three parties have moved for summary judgment. With this factual background in mind, the Court turns to an evaluation of those motions.

## II. Legal Standards

### A. Summary Judgment

When the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," summary judgment is appropriate. FED.R.CIV.P. 56(c). An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir.2001) (citing *Wilkinson v. Powell*, 149 F.2d 335, 337 (5th Cir.1945)). Facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has the initial burden of demonstrating that summary judgment is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and by his own evidence set forth specific facts showing there is a genuine issue for trial. *See Arbaugh v. Y & H*

*Corp.*, 380 F.3d 219, 222 (5th Cir.2004) (citing *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548); *see also* FED.R.CIV.P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994). Instead, the non-moving party must come forward with "specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. Summary judgment should not be granted if the evidence is such that a reasonable fact finder could find in favor of the non-movant. *See id.* at 247–48, 106 S.Ct. 2505. In reviewing a motion for summary judgment, the court views all evidence in the light most favorable to the non-movant. *See Broussard v. Parish of Orleans*, 318 F.3d 644, 650 (5th Cir.2003).

### B. Dispute Resolution Under the RLA

■ "The RLA provides two distinct procedures to promote the resolution of labor disputes," and the procedure employed depends on whether the dispute is deemed major or minor. *Bhd. of Ry. Carmen v. Atchison, T. & S.F.R. Co.*, 894 F.2d 1463, 1466 (5th Cir.1990). The RLA does not use the terms "major" or "minor." Rather, beginning in the case of *Elgin, Joliet, & Eastern Railway Company v. Burley*, the Supreme developed these terms to describe the dispute-resolution process under the RLA. *See generally Elgin, Joliet, & E. Ry. Co. v. Burley*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945).

■ A dispute is major when it involves the formation or the existence of a CBA seeking to govern rates of pay, rules, and working conditions of a carrier's employees. *See Conrail*, 491 U.S. at 302, 109 S.Ct. 2477. "These disputes arise when it is alleged that a CBA is not in place, or when a party seeks to change the terms of an existing agreement. . . ." *Continental Airlines, Inc. v. International Brotherhood of Teamsters*, 391 F.3d 613, 617 (5th Cir.2004). The issue in major disputes, therefore, "is not whether an existing agreement controls the controversy." *Burley*, 325 U.S. at 723, 65 S.Ct. 1282.

■ On the other hand, a dispute is minor when the dispute concerns:

[T]he existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation. . . . In either case the claim is to rights accrued, not merely to have new ones created for the future." *Burley*, 325 U.S. at 723, 65 S.Ct. 1282.

If a dispute is minor, it "is subject to compulsory and binding arbitration. . . ." *Conrail v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 303, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989) ("*Conrail*"). The bodies designated by the RLA to perform such arbitration have exclusive jurisdiction over minor disputes. *See id.* at 304, 109 S.Ct. 2477.

■ In determining whether a dispute is major or minor, a court must "look[ ] to whether a claim has been made that the terms of an existing agreement either establish[es] or refute[s] the presence of a right to take the disputed action. The distinguishing feature of [a case involving a minor dispute] is that the dispute

may be conclusively resolved by interpreting the existing agreement." *Conrail*, 491 U.S. at 305, 109 S.Ct. 2477. Simply put, the difference between major and minor disputes is that "[m]ajor disputes seek to create contractual rights, minor disputes to enforce them." *Conrail*, 491 U.S. at 302, 109 S.Ct. 2477.

■ The party seeking to establish that a dispute is minor bears a "relatively light burden." *Id.* at 307, 109 S.Ct. 2477. Moreover, any doubt as to how to categorize a dispute must be resolved in favor of construing the dispute as minor. *See Ry. Labor Executives Ass'n v. Norfolk & W. Ry. Co.*, 833 F.2d 700, 705 (7th Cir.1987). In resolving the issue of whether a dispute is minor or major, a court is not to evaluate the merits of the dispute. *See Conrail*, 491 U.S. at 318–19, 109 S.Ct. 2477. Instead, a court is to evaluate whether the claim by the party attempting to establish that the dispute is minor is "arguably justified"—that is, unless the claim is "obviously insubstantial, frivolous, [or] made in bad faith" the dispute must be treated as minor. *Id.* at 310, 318–19, 109 S.Ct. 2477.

## C. Injunctive Relief

■ The RLA requires that parties to a major dispute undergo a process of bargaining and mediation and, until such measures are.exhausted, a carrier may not implement the contested change in pay, rules, or work conditions. *See* 45 U.S.C. §§ 155, 156; *see also Conrail*, 491 U.S. at 302–03, 109 S.Ct. 2477. These provisions prohibiting the carrier from implementing the challenged change are known as status-quo provisions and, in major disputes, a district court has subject-matter jurisdiction to enjoin violations of them. *See Conrail*, 491 U.S. at 303, 109 S.Ct. 2477. This may be done without the showing of irreparable injury normally required to obtain

injunctive relief. *See id.* Once RLA dispute-resolution procedures have been exhausted, the parties are free to engage in self-help measures such as a strike. *See id.* at 302–303, 109 S.Ct. 2477; *see also* Norris–LaGuardia Act, 29 U.S.C. §§ 101–115 (prohibiting injunctions in labor disputes); *Order of R.R. Telegraphers v. Chi. & N.W. R. Co.,* 362 U.S. 330, 342, 80 S.Ct. 761, 767–68, 4 L.Ed.2d 774 (1960) (holding that major disputes are covered by the Norris–LaGuardia Act's anti-injunction provisions).

◼ Strikes over minor disputes are prohibited by the RLA and federal courts may use injunctive relief to "compel compliance...." *Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co.,* 353 U.S. 30, 39–42, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); *see also Ry. Exp. Agency, Inc. v. Bhd. of Ry., Airline & S.S. Clerks,* 437 F.2d 388, 393 (5th Cir.1971). Conversely, as a general rule, a labor organization "may not sue for an injunction or damages concerning a 'minor' dispute until after such dispute has been fully processed and disposed of in accordance with the grievance procedures established under the [RLA]." *Int'l Assoc. of Machinists & Aerospace Workers, Airline Dist. 146 v. Frontier Airlines,* 664 F.2d 538, 541 (5th Cir.1981).

### D. Declaratory Judgment

◼ Under 28 U.S.C. § 2201, a party may bring an action in federal court seeking a declaration of "the rights and other legal relations of any interested party seeking such declaration...." 28 U.S.C. § 2201. However, § 2201 "confers discretion on the courts [to grant declaratory relief] rather than an absolute right on a litigant [to such relief]." *Wilton v. Seven Falls Co.,* 515 U.S. 277, 287, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). To determine the propriety of a declaratory judgment, a court must perform a two-part

inquiry. *See Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.*

### III. Analysis

#### A. Major v. Minor Dispute

◼ Because it goes to jurisdiction and the Court's ability to grant the relief requested by the parties, the Court first addresses whether this is a major or a minor dispute. BNSF argues that this case involves a minor dispute because the entire case can be resolved by interpreting the provisions of the 2002 and 2007 Agreements mentioned above. As to BLET, BNSF argues that the 2007 Agreement expressly allows for RCO by crew members other than the engineer.

In its response, BLET argues that the 2007 Agreement's scope rule, while allowing non-locomotive engineers to use RCO in relation to road-service jobs, expressly and unambiguously limits to BLET-represented engineers the right to operate RCO on any road-service jobs. BLET advances the same argument in its own motion for summary judgment. BNSF responds that this argument simply ignores the language of the 2007 Agreement allowing crew members other than engineers to operate RCO equipment while in road service.

As for UTU, BNSF argues that UTU is attempting to use the language excerpted from the 2002 Agreement as a scope rule. According to BNSF, the language from the 2002 Agreement cannot be used as a scope rule because it does not define an exclusive right on behalf of UTU-represented groundsmen to road-service RCO assignments.

UTU responds that the mere fact that the language from the 2002 Agreement is

not presented as a traditional scope rule does not dictate that the language does not grant its conductors the exclusive right to RCO work. UTU emphasizes that the 2002 Agreement states that its assignment of RCO duties "includes, but is not limited to, yard engines, road switchers, locals and other comparable assignments." [UTU Resp. Br. at 5]. In its own motion for summary judgment, UTU notes that the 2002 Agreement states all assignments covered by the agreement, including RCO, "will be assigned to employees represented by" UTU. [UTU Resp. Br. at 11]. UTU argues that these portions of the 2002 Agreement establish UTU-represented employees as the sole source of staffing for all BNSF RCO assignments. As a result, according to UTU, the 2007 Agreement between BLET and BNSF must be seen as an invalid attempt to alter the terms of the 2002 Agreement, creating a major dispute not subject to mandatory arbitration.

In support of this argument, UTU points to the status quo provisions discussed above and case law interpreting them. UTU argues that when a carrier attempts to enter an agreement with one labor organization that would have the effect of altering the terms of an agreement with another labor organization, the attempted agreement is a violation of the RLA's status-quo provisions. *See United Transp. Union v. Cuyahoga Valley Ry.,* 979 F.2d 431, 434–35 (6th Cir.1992); *see also Air Line Pilots Ass'n v. UAL,* 874 F.2d 439, 444–45 (7th Cir.1989). Such a scenario gives rise to a challenge to the validity of the latter agreement and the challenge is a "major dispute." *See Brotherhood of Railway Trainmen v. Howard,* 343 U.S. 768, 774, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952); *see also Cuyahoga Valley Ry.,* 979 F.2d at 435; *UAL,* 874 F.2d at 444–45.

In response, BNSF contends that *Cuyahoga Valley* is inapposite to the present dispute. BNSF notes that in *Cuyahoga Valley,* there was no dispute regarding the interpretation or meaning of the relevant CBAs. *See Cuyahoga Valley Ry.,* 979 F.2d at 435 (noting no dispute regarding the meaning of the CBA was presented). Instead, in *Cuyahoga Valley,* the RLA arbitration board was improperly called upon to resolve the validity of the attempted modification of the CBA that was first in time. *See id.* Similarly, BNSF argues that the issue in *UAL Corporation* was not whether provisions in two CBAs could be harmonized through interpretation, but was instead the validity of an express attempt by an airline to alter a prior CBA with one labor organization through the provisions of a later CBA with another labor organization. *See UAL Corp.,* 874 F.2d at 444–45. Therefore, according to BNSF, because this case is one in which the competing CBAs may be harmonized through interpretation, cases such as *Cuyahoga Valley* and *UAL Corporation* do not control the classification of the current dispute.

UTU also contends that any interpretation of the 2002 Agreement other than one assigning all RCO duties to groundsmen it represents would render the "but not limited to" language of the agreement superfluous. This is not the first time it has made such an argument. In a case very similar to this one, UTU filed suit alleging that the 2002 Agreement gave it the exclusive right to perform RCO assignments for CSX Transportation, another NCCC-represented carrier. *See United Transp. Union v. CSX Transp.,* No. 1:07–CV–1549 at 1, 2008 WL 5210761 (N.D.Ohio July 10, 2008). The basis of UTU's complaint was an agreement reached between the CSX and BLET that purported to assign road-service RCO to BLET engineers. *See id.* at 5–6. There, as here, UTU argued that

the "but not limited to" language of the 2002 Agreement gave UTU-represented groundsmen the exclusive right to perform all of CSX's RCO assignments. *See id.* at 16. Based on the non-exclusive language used in both of · the agreements at issue and the circumstances of the agreements, the United States District Court for the Eastern District of Ohio concluded that CSX's argument that the three-way dispute could be resolved by interpreting the CBAs was not frivolous. *See id.* at 16–17. As a result, the court held the dispute to be minor and, therefore, subject to arbitration under the RLA. *See id.* at 22.

Just as in the case before the Eastern District of Ohio, both CBAs at issue in this case have non-exclusive language. The 2007 Agreement states that road-service RCO is assigned to BLET represented engineers "provided such assignment would not preclude use of remote control equipment by others in addition to the engineer." [BNSF Motion App. at 55]. And UTU relies in this case on the very provision that the Eastern District of Ohio concluded is "non-exclusive." *See CSX Transp.,* No. 1:07–CV–1549 at 17. The Court agrees with the court in *CSX Transportation* that the 2002 Agreement language assigning to UTU-represented groundsmen certain enumerated RCO tasks, as well as "other comparable assignments," is by its terms non-exclusive.

Both BLET and UTU argue that, despite the qualifying language in both CBAs, their respective agreements with BNSF give the employees represented by each the exclusive assignment to road-service RCO. These arguments are, of course, in tension with each other to the extent that both BLET and UTU are attempting to establish their own exclusive right to perform road-service RCO assignments. Yet, in arguing for such a right, both contend that BNSF has failed to establish

that this dispute is minor because BNSF has not shown that an ambiguity exists in the terms of the 2002 or 2007 Agreements. This argument is based on their contention that BNSF has offered no interpretation alternative to their own for the relevant provisions of the agreements.

BNSF has, however, offered an alternative interpretation. In its motion for summary judgment, BNSF notes that road service, which involves moving freight over long distances, is fundamentally different than the ground service generally performed within switching limits. BNSF asserts that certain tasks performed outside switching limits, i.e., outside of the bounds of a terminal or train yard, are very similar to the ground service performed while in switching limits.

At this point the Court notes that part of the difficulty in this case derives from the fact that the railroad industry has developed its own lexicon. Terms and phrases such as "road service" and "switching limits" are imprecisely defined by custom and practice. None of the parties attempt to define the terms and the Court is unaware of case law that attempts to do so. Nevertheless, the nature of the parties' arguments and their use of the terms provides some guidance.

BNSF speaks of road service as meaning something along the lines of a long-distance movement of freight in a completed train at high speeds. BLET speaks of road service in terms of being everything but service within switching limits. The Court takes the term "switching limits" to mean "within the bounds of a train yard, terminal, or similar area."

The 2007 Agreement assigns road-service RCO to BLET engineers, subject to the proviso that others are not precluded from operating RCO equipment while in road service. The 2002 Agreement assigns an enumeration of RCO jobs associ-

ated with train yards or terminal-type areas (i.e. switching limits) to UTU groundsmen, as well as "other comparable assignments." The question becomes whether these CBAs may be harmonized by interpreting their provisions so as not to conflict, or whether the existence of one calls into question the validity or creation of the other. *See Conrail,* 491 U.S. at 305, 109 S.Ct. 2477 (noting that the distinction between major and minor disputes is that minor dispute can be resolved through interpreting existing agreements). To the extent the phrase "road service" is strictly defined as any operation of a locomotive outside of switching limits, it would seem that UTU could make no claim to road-service RCO, because the 2002 Agreement grants its groundsmen RCO assignments associated with terminal and train yards and "other comparable assignments." However, the concept of road service likely also incorporates factors such as whether the locomotive is engaged in the movement of freight between distant points and the speed of the locomotive. If this is the case, then "other comparable assignments" may well encompass those tasks that, while performed outside of switching limits, are nevertheless more like tasks that are performed within switching limits than a long haul of freight at high speed, i.e., road service. Allowing groundsmen to perform such tasks may well have been the purpose of the provision in the 2007 Agreement that others are not precluded from operating RCO while in road service, despite the assignment of the task to engineers. Suffice it to say that this is a question of interpretation, and, therefore, a question designated for arbitration by the RLA. *See Conrail,* 491 U.S. 303–05, 109 S.Ct. 2477 (concluding that a dispute that can be resolved through interpretation is minor and that minor disputes are subject to arbitration).

Such an interpretation of the two CBAs is quite reasonable under the circumstances of this dispute. *See CSX Transp.,* No. 1:07–CV–1549 at 16–17 (looking to the circumstances of the agreement in resolving the major-minor dispute issue); *see also Conrail,* 491 U.S. at 311, 109 S.Ct. 2477 ("[I]t is well established that the parties' practice, usage and custom is of significance in interpreting their agreement.") (citation and internal quotation omitted). In support of its motion for summary judgment, BNSF has submitted the findings in the court-ordered arbitration in *Burlington Northern & Santa Fe Railway Company v. Brotherhood of Locomotive Engineers. See* 2002 U.S. Dist. LEXIS 1249, at *9–21 (N.D.Ill.2002). There, the arbitrator notes that control of a locomotive has traditionally been the province of groundsmen. Groundsmen, as a general rule, instruct the engineer on where to go and how to get there. Engineers operate the train to accomplish these instructions. Control decisions within a yard or terminal have historically been made by groundsmen because the operation of trains in the close quarters of these areas can be perilous to those on the ground, and the necessary maneuvers difficult to perceive from the engineer's vantage point. An engineer's compliance with the instructions of groundsmen is necessary to carry out the collection and distribution of train cars, the essential function of a train yard or terminal. Given this historic division of labor, which neither BLET or UTU contests, it seems quite reasonable that BNSF would enter agreements allowing engineers to perform RCO assignments while in road service, and allowing groundsmen to perform RCO assignments while in yards, terminals, or comparable areas, regardless of whether such assignments will be performed strictly within switching limits.

Furthermore, such an interpretation would avoid the very thing that UTU and BLET have argued against—rendering portions of the 2002 and 2007 Agreements meaningless. BLET has asserted in its response to BNSF's motion for summary judgment, as well as in its own motion, that the 2007 Agreement is "unambiguous" and "makes crystal clear" that only BLET represented engineers have the right to operate RCO during road service jobs. But BLET has failed to explain what, assuming such an interpretation, could be meant by the language that others are not precluded from use of RCO equipment during road service jobs.

As noted above, UTU argues that interpreting the 2002 Agreement as granting groundsmen anything less than the exclusive right to perform RCO assignments for BNSF renders the "but not limited to" language meaningless. However, this argument ignores the fact that the 2002 Agreement grants UTU-represented employees certain enumerated RCO assignments associated with terminals and train yards, as well as "other comparable assignments." Under the interpretive canon of ejusdem generis, "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 114, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (discussing ejusdem generis in the context of statutory construction); *see also Bloom v. Hearst Entertainment,* 33 F.3d 518, 524 (5th Cir.1994) ("The rule of ejusdem generis applies where specific recitals in a contract are either preceded or followed by an omnibus clause...."). While the precise contours of the meaning of the term "road service" are not clear, it is certain that groundsmen and engineers have traditionally performed different

tasks regarding the operation of a locomotive, and the terms "road service," and "switching limits," are used to connote the division of labor. *See CSX Transp.,* No. 1:07–CV–1549 at 2–3 (discussing the relationship between engineers and groundsmen). Thus, the phrase "including, but not limited to" cannot be interpreted as assigning all road service RCO to UTU groundsmen. To the extent that road service connotes the movement of freight between distant points at high speeds, as opposed to low-speed operation of locomotives in the close quarters of an area such as a terminal or train yard, the specifically enumerated assignments in the 2002 Agreement are not comparable to road service as required by the agreement, and "including, but not limited to" could not embrace road service under ejusdem generis.

**B.   Declaratory Relief**

■ The Court concludes that it is proper to enter a declaratory judgment that the dispute in this case is a minor dispute. To the extent that the Court has been called upon to resolve the issue of whether the dispute in this case is major or minor, there is clearly a controversy subject to resolution under the Declaratory Judgment Act. *See Bauer v. Texas,* 341 F.3d 352, 358 (5th Cir.2003) (requiring allegation of substantial likelihood of injury that is not merely conjectural, hypothetical, or contingent). BNSF alleges that UTU has struck against another carrier over this exact issue and that it has been unable to implement its agreement with BLET for fear that UTU will strike in this case. Further, as all the parties recognize, resolution of this dispute is governed by the RLA and cannot progress until it is determined whether this dispute is major or minor. The essential facts surrounding that controversy are undisputed as well. BNSF has entered into agreements with

both BLET and UTU. The issue is simply whether those agreements are in such conflict so as to make the second an attempt to alter the first or whether the inconsistency may be resolved through interpretation. Therefore, this case is fit for judicial review. *See Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. 1507 (concluding a purely legal issue requiring no additional factual development is fit for judicial review).

Moreover, given the nature of dispute-resolution proceedings under the RLA, the parties would suffer hardship should the Court withhold consideration. What dispute-resolution procedures are available to the parties under the RLA is determined by whether the dispute is major or minor. *See Bhd. of Ry. Carmen,* 894 F.2d at 1466. Thus, the parties must be provided a judicial decision on this issue in order to know how to proceed in resolving their dispute.

The Court concludes that this case may be resolved by interpreting the 2002 and 2007 Agreements. As a result, BNSF's claims are not obviously insubstantial or frivolous. *See Conrail,* 491 U.S. 310, 109 S.Ct. 2477 (concluding claim of party asserting the dispute is minor need only be arguably justified). Therefore, this case involves a minor dispute subject to the mandatory arbitration provisions of the RLA. *See* 45 U.S.C. § 153 First; *see also Conrail,* 491 U.S. at 305, 109 S.Ct. 2477.

### C. Injunctive Relief

As noted above, a federal court may use injunctive relief to prevent a strike during the resolution of a minor dispute. Although BNSF asserts a claim for injunctive relief in its complaint, it does not address this claim in its motion for summary judgment. It is, therefore, not before the Court to decide.

BNSF does argue in its motion that BLET's claim for injunctive relief is moot. In its complaint as intervenor, BLET asserts a claim for an injunction requiring that it be made a full party to any arbitration under the RLA that interprets the meaning of the 2007 Agreement. The parties have executed an agreement requiring that BLET be given full-party status in any RLA arbitration dealing with the disputes at issue in this case. Therefore, BLET's request is moot. *See Harris v. City of Houston,* 151 F.3d 186, 189 (5th Cir.1998) ("A request for injunctive relief generally becomes moot upon the happening of the event sought to be enjoined.").

### IV. Conclusion

Accordingly, after review of the record and the relevant provisions of the 2002 Agreement and the 2007 Agreement, the Court concludes that this case may be resolved through an interpretation of those provisions. As a result, the dispute between the parties is a minor dispute and subject to the mandatory arbitration provisions of the RLA. Moreover, BLET's claim for an injunction making it a full party to any arbitration under the RLA in this case is mooted by the agreement of the parties. Therefore, BNSF's motion for summary judgment is GRANTED. The motions for summary judgment by BLET and UTU are DENIED.